**UNITED STATES of America**

v.

**Angelo BRUNO et al.**

**Crim. No. 70–12.**

United States District Court,
E. D. Pennsylvania.

Sept. 24, 1971.

William D. Hyatt, Richard T. Spriggs, Washington, D. C., for the Government.

Raymond J. Bradley, Lester J. Schaffer, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

MASTERSON, District Judge.

The above-named defendants were charged in a three-count indictment with various criminal acts involving the preparation and subsequent audit of the 1965 individual income tax return of Sue Bruno. Count I charged defendants, Angelo Bruno, Martin A. Coopersmith and Marvin J. Levin, with unlawfully conspiring to defraud the Government by obstructing the Internal Revenue Service in its audit of Mrs. Bruno's return.[1] Count II charges defendant Angelo Bruno with unlawfully assisting in the preparation of a false and fraudulent return,[2] and Count III charges Mrs. Bruno with knowingly subscribing to that return.[3]

On the motion of defendants Levin and Coopersmith, a motion in which neither Angelo Bruno nor Sue Bruno

---

1. 18 U.S.C. §§ 371, 1001 and 1510, 26 U.S.C. § 7212.

2. 26 U.S.C. § 7206(2).

3. 26 U.S.C. § 7206(1).

joined, we entered an Order severing the charge of conspiracy against Levin and Coopersmith from the remaining charges against the Brunos, so that Levin and Coopersmith were granted a separate trial on the conspiracy charge. A three week jury trial ensued, and at the conclusion of the evidence, we granted the defendants' Motion for a Judgment of Acquittal for reasons which are explained below. Relying on the court's determination in the first trial, defendants, Angelo and Sue Bruno, have moved to dismiss the indictment as to all charges. For the following reasons, we have decided to grant the motion to dismiss as to Count I, and to deny the motion as to Counts II and III.

## I. COUNT I OF THE INDICTMENT

### A. INSUFFICIENCY OF THE EVIDENCE

The entire thrust of the Government's case against Levin and Coopersmith in the first trial on the conspiracy charge was that they had prepared a "false, fraudulent and counterfeit letter dated December 18, 1965" which the Government contended was actually signed some time between May of 1967 and March 24, 1969. The Government alleged that pursuant to an agreement between Penn Jersey Vending Company and John's Vending Company, which passed to Mrs. Bruno and Bruno upon the dissolution of Penn Jersey, certain commissions with an ascertainable value were taxable to Mrs. Bruno and should have been included in her income tax return for 1965. In the latter part of 1968, the Internal Revenue Service began investigating Mrs. Bruno's return. In March of 1969, at a conference with an investigator of the Regional Counsel's office, defendant Levin produced the original copy of the December 18, 1965 letter which purportedly was a cover letter from Coopersmith to Levin forwarding certain documents pertaining to Penn Jersey's 1965 income tax return and the 1099 forms from Mrs. Bruno. The Government alleged that the letter was fraudulently prepared during the Internal Revenue Service investigation to insulate the Brunos from prosecution by injecting a defense that the Brunos acted with the knowledge and advice of counsel. Virtually the whole trial was devoted to litigating the authenticity of this so-called "questioned document."

Through the testimony of its expert witness, Richard Brunelle, the Government attempted to prove that the ball point ink with which Coopersmith signed the questioned document was a type manufactured by the Scripto Company (Scripto 3852), production of which did not commence until May of 1967, and, therefore, the disputed letter could only have been signed subsequent to the date appearing on it. To support this allegation, the Government assumed the burden of excluding all of the ball point inks manufactured anywhere in the world for an indefinite period before December 1965.

After hearing the testimony of the witnesses on both sides, we decided that a jury could not have concluded beyond a reasonable doubt that the defendants were guilty of this charge because of the insufficiency of the evidence in the following respects.

### 1. INHERENT INADEQUACIES OF THE IDENTIFICATION TECHNIQUE.

Brunelle claims to be able to identify the precise origin or type of ink through a complicated technique of comparative analysis. First, he takes several "plugs" or punched holes about the size of the end of a hypodermic needle from the questioned signature. He then dissolves the plugs in a solution, and using a capillary tube, he places a small amount of the solution on a coated plate or "chromatogram." On the chromatogram, the ink separates into its component dyes. He first makes a visual comparison of the unknown ink with chromatograms he has prepared of known samples in his "ink library," making rough subjective judgments as to differences in hue and intensity of color. If the visual comparison is not sufficient to

distinguish the inks, Brunelle objectively measures the separation of the dyes and the width of the dye columns, and again comparing these measurements with those he has made of his ink library samples, he makes his identification.

Perhaps the most basic flaw in Brunelle's procedure is that his "ink library" was so incomplete that it was impossible for him to exclude a great number of inks which he never had examined. He conceded that he had no foreign ink library; that he had no Japanese inks,[3](a) nor those of a number of other countries. (N.T. 556–7). Obviously, a procedure which relies entirely on comparison and elimination cannot be used to make a positive identification when an unknown number of inks cannot be excluded.

Furthermore, Brunelle's results are affected to an unknown extent by a great number of variables. A trier of fact would have to speculate about the importance of these variables, especially when the witness could not recall and could not document how these factors could have altered his results. First, there is no way to measure the quantity of ink that is removed from the questioned signature (N.T. 652). Therefore, each "plug" from the questioned document contained an unknown quantity of ink and Brunelle admitted that different concentrations of ink on paper were compared. (N.T. 761). Furthermore, Brunelle had no idea how many plugs he took from the document and put into solution, (N.T. 653), and he did not know the strength of the solution (N.T. 654). Although different solvent systems can give different separations of the dye components (N.T. 783), comparisons were made of dyes in different solvents (N.T. 787). In putting the plug into solution, the paper necessarily is mixed in (N.T. 654), but Brunelle ran no chromatographic test on the paper itself. (N.T. 658). He also conceded that scribble samples of a known ink were taken from a type of paper different from the questioned document (N.T. 676). Brunelle testified that the distance that a dye will travel on a chromatogram will not be uniform because of the nature of the coating on a chromatogram plate, (N.T. 659), and that a chromatogram result can be affected by the manner in which the ink is placed on the chromatogram (N.T. 805). Finally, Brunelle knew that ultraviolet light causes the dyes to fade and can even change the relative intensities of the dyes on the chromatogram, (N.T. 838) but he had no idea as to how long the questioned document had been exposed to ultraviolet light. Perhaps even more basic than these variables is the fact that none of the manufacturers who testified stated that the production of inks is so uniform that two batches of the same ink would give uniform chromatographic results. In fact, the representative of the Scripto Company testified that the actual composition of its inks will change over a period of time (N.T. 419). Brunelle conceded that the same dye in inks manufactured by different companies would not necessarily be identical (N.T. 774).

As if to demonstrate the unpredictable effects of all these variables, Brunelle showed us a slide in which three chromatograms of the *same ink* showed entirely different results (N.T. 805). He conceded that he could not tell on the basis of these chromatograms that they were all prepared using the same ink (N.T. 812).

We are convinced that the state of the art in this field of ink identification is not yet sufficiently advanced to be reasonably scientifically certain that an ink of unknown composition is the same as a known ink. The most that can be said is that an unknown ink *appears* to be similar to or different from a known ink. The technique used by Brunelle was first developed in 1967 (N.T. 1259), and Brunelle has been using this pro-

---

3(a). The record shows that in 1965 alone 822,600 ball-point pens were imported into the United States from Japan in addition to 550 pounds of ink cartridges and 28,242 pounds of ball-point ink. (N.T. 1614–1621).

cedure only three years (N.T. 542). It is most interesting that the scientist who developed and taught Brunelle the solvent system for using this chromatographic analysis (N.T. 907) testified that because the "variables haven't been investigated thoroughly" (N.T. 1289), and because the questioned ink has no unique pattern, the state of the art is such that it cannot be positively identified (N.T. 1290). This view is shared by all of the experts in chromatographic identification who testiifed, other than Brunelle (N.T. 1053, 1248, 1366).

In Frye v. United States, 54 App.D.C. 46, 293 F. 1013, 1014 (1923), the court, in deciding that the results of polygraph tests are not admissible, made this statement as to scientific evidence:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

We decided, therefore, that we could not allow a jury to speculate as to the guilt or innocence of Levin and Coopersmith based entirely on this ink-identification evidence which has not achieved this level of acceptance.

## 2. INADEQUACY OF BRUNELLE'S METHOD

■ Apart from this inherent inadequacy in the identification technique, we had grave doubts as to the reliability of Brunelle's methodology in conducting these tests. It is widely recognized that the party offering the results of laboratory tests must not only produce an expert to attest to the scientific reliability of the test, but also, he must vouch for its correct administration in the par-

ticular case. See McCormick, Handbook of the Law of Evidence p. 357 (1954).

Contrary to the accepted practice in every laboratory, Brunelle kept no detailed log concerning the tests he was performing. (N.T. 575, 616–18, 643, 675). Not only did this make cross-examination difficult, but it also made it impossible for a jury to evaluate his findings. For example, it could not be determined whether any experiments had given negative or conflicting results. He permitted the solution in the chromatogram procedures to "run" only 30 minutes, which fails to permit the more definitive separation a longer period would provide. (N.T. 769). Although he said that he had experimented with longer runs, he had no such results and had no notes concerning them. Finally, he testified that the original comparison chromatograms were made on glass plates which quickly faded, but that no photographic slides were made of these plates. (N.T. 669–70). Consequently, there were no exhibits of any chromatographic plates or slides which displayed the ink from the questioned document alongside the known inks which were believed to be similar (N.T. 764-5). Since Brunelle's examination of these plates gave him reason to single out Scripto 3852 as the questioned ink, the destruction of this crucial evidence, without photographing the plates, made it impossible for the jury to see the basis for his conclusion, and left the defendants with no opportunity to cross-examine him on this vital point.

■ Considering all of the above, it is clear that the Government failed to establish a prima facie case and failed to meet the minimum standards of proof. The only defect which the Government offers to cure in a trial of Bruno on the conspiracy charge is the completeness of Brunelle's ink library. Subsequent to the first trial, Brunelle purportedly was able to secure a large number of foreign ink samples from Interpol in Switzerland. However, the Government concedes that the library is not complete as to all European inks and

the added samples still do not include the Japanese inks. More importantly, the mere addition of more inks to Brunelle's library does not cure the inherent defects in the identification process nor in the particular procedures followed by Brunelle which in this case amount to a denial of procedural due process because the very procedures he followed assured the destruction of the defendants' right to meaningful cross-examination. We hold, therefore, that none of Brunelle's identification testimony would be admissible in a future trial of Bruno, and that since the Government concedes it has no other way in which to challenge the authenticity of the questioned document, Bruno's motion to dismiss the indictment as to the conspiracy count must be granted.

## B. COLLATERAL ESTOPPEL

But for the severance which defendant Bruno had not requested, it is clear that our decision in the first trial would have resulted in his acquittal on the conspiracy charge. In these coincidental circumstances, the Government asks for a second chance and three more weeks of the court's time to challenge the authenticity of the questioned document. Apart from the evidentiary defects of the Government's case, the policy reasons for the application of the doctrine of collateral estoppel are fully applicable:

"Relitigation results in waste of public funds and the valuable time of the court with already crowded dockets, and delays the opportunity of other citizens to gain initial adjudication of their claims. * * * A single criminal suit is likely to involve a greater expenditure of public funds since it involves the additional expense of prosecution. A policy forbidding re-

examination of issues encourages care in the preparation and presentation of the prosecution's initial case." [4]

We must decide whether there is any reason why the Government should not be collaterally estopped from relitigating the authenticity of the questioned document.

In the recent case of Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) the Supreme Court reinforced the view generally recognized in the federal courts that collateral estoppel is available as a defense in criminal trials: [5]

" 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in United States v. Oppenheimer, 242 U.S. 85, [37 S.Ct. 68, 61 L.Ed. 161]. As Mr. Justice Holmes put the matter in that case, 'It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt.' 242 U.S., at 87 [37 S.Ct. 69]. As a rule of federal law, therefore, '[i]t is much too late to suggest that this principle is not fully applicable to a former judgment in a criminal case, either because of lack of "mutuality" or because the judgment may reflect only a belief that the Government had not met the higher burden of proof ex-

4. Mayers & Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.R. 1, 31–32 (1960).

5. See also Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948); United States v. DeAngelo, 138 F.2d 466 (3rd Cir. 1943); United States

v. Simon, 225 F.2d 260 (3rd Cir. 1955); United States v. Kenny, 236 F.2d 128 (3rd Cir. 1956); Yawn v. United States, 244 F.2d 235 (5th Cir. 1957); Cosgrove v. United States, 224 F.2d 146 (9th Cir. 1954); Williams v. United States, 179 F.2d 644 (5th Cir. 1950); United States v. Kaadt, 171 F.2d 600 (7th Cir. 1948).

acted in such cases for the Government's evidence as a whole although not necessarily as to every link in the chain.' United States v. Kramer, [2 Cir., 289] F.2d 909, 913."

The judge-made doctrine of mutuality of estoppel [6] required that unless both parties (or their privies) in a second action are bound by a judgment in a previous case, neither party (nor his privy) in the second action may use the prior judgment as determinative of an issue in the second action. Thus, the principle was applied only where the second litigation was between the same parties who had participated in the original litigation (or their privies). However, following the lead of the Supreme Court of California in Bernhard v. Bank of America Nat. Trust & Savings Ass'n, 19 Cal.2d 807, 122 P.2d 892 (1942), rigid application of the rule began to fade, especially where the prior judgment was invoked defensively in a second action against a plaintiff bringing suit on an issue he litigated and lost as plaintiff in a prior action. See Blonder-Tongue Laboratories, Inc. v. University, etc., Foundation, 402 U.S. 313, 323–327, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Courts have begun to recognize that the doctrine of mutuality is essentially a due process concept which should be retained only where the party sought to be estopped did not have a full and fair opportunity to litigate the issue effectively. Provident Tradesmens Bank & Trust Co. v. Lumbermens Mut. Cas. Co., 411 F.2d 88, 93 (3rd Cir. 1969).

■ The application of collateral estoppel to criminal cases has been favored despite the fact that there can never be mutuality between the prosecution and the defense. An accused is always constitutionally entitled to a trial de novo of the facts alleged and offered in support of each offense charged against him, and collateral estoppel is available as a defense even though it can never be raised offensively by the prosecution. United States v. DeAngelo, *supra*.[7] Thus, we are unimpressed with the argument that we cannot apply the doctrine of collateral estoppel here because the Government's case is against a different defendant. As explained above, the decline of the mutuality rule has led to the application of collateral estoppel in civil cases by litigants who were not parties to the previous action. See, e. g., Bruszewski v. United States, 181 F.2d 419 (3rd Cir. 1950) (plaintiff collaterally estopped from suing Government for negligence when he had lost on the same claim against private party); United States v. Webber, 396 F.2d 381 (3rd Cir. 1968) (Government could take affirmative advantage of prior decision by invoking collateral estoppel although it had not been a party in the previous litigation).

■ We see no reason why the teaching of these cases is not fully applicable to criminal cases. We hold, therefore, that having had a full and fair opportunity to attack the authenticity of the questioned document in the first case, the Government is collaterally estopped from relitigating that issue. Since there is no other overt act to support the conspiracy charge,[8] the motion to dismiss Count I of the indictment must be granted. Herman v. United States, 289 F.2d 362 (5th Cir. 1961).

6. See generally Currie, Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine, 9 Stan.L.R. 281 (1957) ; Semmel, Collateral Estoppel, Mutuality and Joinder of Parties, 68 Colum.L.R. 1457 (1968).

7. See The Use of Collateral Estoppel Against the Accused, 69 Colum.L.R. 515 (1969).

8. The indictment charges as an "overt act" Angelo Bruno's execution of a power of attorney authorizing Marvin J. Levin to represent him before the Internal Revenue Service in 1966. There seems to be some doubt as to whether that had anything to do with Sue Bruno's 1965 tax return, but in any event, it is clear to us that we cannot allow a conspiracy prosecution where that is the only overt act charged. As explained above, the Government's entire case of conspiracy against the defendants rested upon the genuineness of the questioned document.

## C. CONSPIRACY

The acquittal of Levin and Coopersmith has left defendant Bruno alone to face the charge of conspiracy. We are persuaded that no construction of the conspiracy statute [9] nor the decisions which have construed it permit the Government to try a single defendant on this charge which by definition requires the participation of two or more conspirators.

■ The United States Supreme Court has made it abundantly clear that "it is impossible in the nature of things for a man to conspire with himself", and that "conspiracy imports a corrupt agreement between not less than two with guilty knowledge on the part of each." Morrison v. California, 291 U.S. 82, 92, 54 S.Ct. 281, 285, 78 L.Ed. 664 (1934) (Conspiracy conviction of A reversed where insufficient evidence to support conviction of B.) See also Hartzel v. United States, 322 U.S. 680, 64 S.Ct. 1233, 88 L.Ed. 1534 (1944) (Conviction of third member of conspiracy reversed where trial judge had set aside conviction of one co-conspirator and the Court of Appeals had set aside the conviction of the other); Bates v. United States, 323 U.S. 15, 65 S.Ct. 15, 89 L.Ed. 13 (1944)) Conviction vacated where co-conspirator's conviction had been reversed by Court of Appeals). It is now firmly established that the acquittal of all other co-conspirators precludes the conviction of the remaining defendant. United States v. Fox, 130 F.2d 56 (3rd Cir. 1942) cert. denied, 317 U.S. 666, 63 S.Ct. 74, 87 L.Ed. 535 (1942) (dictum); Lubin v. United States, 313 F.2d 419 (9th Cir. 1963); Romontio v. United States, 400 F.2d 618 (10th Cir. 1968).[10]

Recognizing this principle, the Government nevertheless argues that it is inapplicable since the indictment charges that the named defendants conspired with each other "and with other persons unknown to the Grand Jury," and that the testimony of Government witness, Nathan Ellman, at the first trial established that he was one of the "unknown co-conspirators." See Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951). Not only must evidence show that such an individual was unknown to the Grand Jury, but the evidence must be sufficient to prove that the unknown person assisted Bruno in the carrying out of the conspiracy. Worthington v. United States, 64 F.2d 936 (7th Cir. 1953); Pomerantz v. United States, 51 F.2d 911 (3rd Cir. 1931).

■ This afterthought by the Government does not persuade us. Even if Ellman was "unknown to the Grand Jury" in that they did not know of his role in the alleged conspiracy,[11] in view of our conclusion as to the collateral estoppel effect of the result of the first trial, we fail to see how Ellman's testimony would provide any basis for prosecuting a conspiracy between him and Bruno. Ellman was called as a Government witness, but on cross-examination he revealed that he participated in the drafting of the "questioned document" which forms the basis of the conspiracy charge. We have held, however, that the Government has had its opportunity to litigate the authenticity of the letter, and since Ellman's testimony reveals no other overt act which would bring him into

9. "If *two or more persons* conspire to commit any offense against the United States, * * * or any agency thereof in any manner or for any purpose and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. * * *" 18 U.S.C. § 371. (emphasis added).

10. The fact that we have granted a severance and the co-conspirators are tried separately is irrelevant. In the cases presented to us, the fact of the severance is important only in that the co-conspirators had not yet been tried. See DeCamp v. United States, 56 App.D.C. 119, 10 F.2d 984 (1926); United States v. Shipp, 359 F.2d 185 (6th Cir. 1966).

11. This is difficult to understand in light of the fact that Ellman had testified before the Federal Grand Jury prior to the issuance of the indictment.

the conspiracy, defendant Bruno remains alone to face that charge. Since this is impermissible under the law of conspiracy, the motion to dismiss the conspiracy count must be dismissed on this ground alone.

## II.   COUNTS II AND III OF THE INDICTMENT

■ The defendants concede that the judgment of acquittal for Levin and Coopersmith on the charge of conspiracy does not necessarily preclude the prosecution on the substantive charges related to that conspiracy. They argue, however, that since the Government is precluded from using the ink identification testimony to rebut any testimony given by Levin and Coopersmith, the Government could not convict Mr. and Mrs. Bruno of the substantive offense. The argument relies on the premise that if the Brunos acted on the advice of counsel (Mr. Levin), this would constitute a complete defense. Without considering the correctness of this assumption, it is obvious that the question as to whether the Brunos actually relied on the advice of counsel should be decided by a jury and not by this court on a motion to dismiss.

As stated above, the material matter in the trial on Counts II and III will turn on whether the right of Penn Jersey Vending, Inc. to receive certain commissions under an agreement with John's Vending Company, which passed to Mrs. Bruno upon the dissolution of Penn Jersey, had an ascertainable value which should have been included in Mrs. Bruno's income tax return for 1965. Certainly, this was not a question which was fully litigated in the first trial. The defendants ask us to look at the inadequacies of the Government's testimony as to the valuation question in the brief reference to it at the first trial, and anticipate that the Government will not be able to explore the issue in any more depth in the subsequent litigation. Clearly, we cannot make such a supposition.

The motion to dismiss as to Counts II and III will be denied.