Richard **EIFLER** Appellant,

v.

**STATE of Indiana** Appellee.

No. 82A04–8908–CR–368.

Court of Appeals of Indiana,
Fourth District.

April 22, 1991.

Wayne S. Trockman, Newman, Trockman, Lloyd, Flynn and Rheinlander, Evansville, for appellant.

Linley E. Pearson Atty. Gen. Margarett L. Knight Deputy Atty. Gen., Indianapolis, for appellee.

MILLER, Judge.

Defendant-appellant Richard Eifler appeals from a jury conviction for forgery[1] by signing a letter dated December 2, 1981, which the State contends was actually made on or about October 27, 1983, with an intent to defraud the Evansville Utility Board and Sewer Department (Board) into giving a discount on sewer tap-in fees.

We reverse, finding the evidence was insufficient to prove Eifler had an intent to defraud. Because we reverse, we need not address other issues raised by Eifler.

## DISCUSSION AND DECISION

Eifler was Evansville City Engineer from 1981 until 1986. His job description did not include any authority to make policy or modifications with regard to sewer tap-in fees. He was indicted on June 15, 1988, by a grand jury, along with two other defendants, John Vezzoso (former President of the Evansville Board of Public Works) and Andy Easley (real estate developer). The indictment was in two counts against all three defendants. Count I charged forgery of a written instrument (a letter dated December 2, 1981) with the intent to defraud the Evansville Utility Board and Sewer Department. The indictment alleged the letter was written at a time other than December 2, 1981. Count II charged the three defendants with conspiracy to commit forgery by agreeing with each other to execute a written instrument (the same letter referred to in count I) with the intent to defraud the Board. Vezzoso[2] and Eifler were found guilty of forgery, but acquitted of the conspiracy charge. Easley was found *not* guilty on both counts. Eifler received a two year sentence suspended to unsupervised probation and a $1,000 fine.

The indictments in this case arose out of confusion over the applicable rates for sewer connection charges for the St. Joseph Business Park which was constructed by Easley between 1976 and 1977. At that time, the city of Evansville did not have sufficient funds to extend sewer connections to new developments and enacted Ordinance No. G–76–12 to induce developers to advance their own funds to build sewer line extensions to the existing municipal system.[3] In some cases, the Board of Pub-

---

1. Ind.Code 35–43–5–2 provides that forgery is committed when a person, with an intent to defraud, makes or utters a written instrument in such a manner that it purports to have been made 1) by another person, 2) at another time, 3) with different provisions, or 4) by authority of one who did not give authority.

2. Vezzoso is not appealing his conviction.

3. Evansville City Ordinance G–76–12 which was then in full force and effect (the 1976 Ordinance), provided at Paragraphs 4(b) and (d) as follows:

(b) A tap-in for an improvement located more than 150 feet from any portion of the sewer system owned or operated by the City, and which improvement is tapped into any sewer line, either directly or indirectly, by reason of having been connected to a sewer line which eventually extends to or connects to or flows into a sewer line owned and operated by the City; Forty Percent (40%) of the rates established as set forth in Section 3 above.

* * * * * *

(d) For existing sanitary sewer lines constructed by Developer for which no contract was entered into between the Developer and the City and there is real estate within the Development, served by the existing sanitary sewer line and adjacent to the lines which real estate has not been tapped into and connected to the sewer lines, then the tap-in and connection charge for said adjacent real estate shall

lic Works would enter into *recoupment* contracts wherein the contractor would build a sewer line for a new development and would be reimbursed for his expenses as individual lot owners paid full tap-in fees—the contractor receiving a percentage of the fees paid until his investment had been recouped. An alternative—codified in the ordinance—allowed a developer to build a private extension for which he received no reimbursement, which entitled individual lot owners to tap into the sewer at the forty percent rate.[4] On November 17, 1976, while the ordinance was in effect, Easley presented plans for a private sewer line to the St. Joseph Avenue Business Park Subdivision to the Board of Public Works. It is undisputed the plans were approved by the Works Board, and the sewer line extension was built and accepted for maintenance by the Works Board on October 5, 1977. Easley did not have a recoupment contract with the city nor was he ever reimbursed for his expenses. Thus, his project fell under the alternative codified in the ordinance where no contract or agreement was needed.

The ordinance was amended in 1978 so that the forty percent rate no longer applied to commercial or industrial subdivisions, but left unaffected Section 4(d) of the 1976 ordinance which provided for the reduced rate for tap-ins to existing sewer lines constructed by a developer. When the ordinance was amended, Easley's sewer already existed. Thus, any individual who tapped into the sewer before or after the 1978 amendment was entitled to the forty percent rate under the ordinance.[5]

In January of 1983, the Board of Public Works and the Sewer Board were merged into one Utility Board. The new Board began to make changes in the operations affecting the Water Department and the Sewer Department in order to plan for capital expenditures and rate increases. Robert Leich, a former Utility Board President and member of the utility boards from 1980 through 1986, testified at trial that before the merger, the Water Department rates were set by application to the Public Service Commission in Indianapolis, but the Sewer Department had always set rates by ordinance. He also testified that when the boards merged, the Board members did not have a lot of knowledge about any rules and regulations affecting the utilities, but attempted to set up a procedure to honor commitments made by the City in regard to past sewer matters. Rather than seeking legal interpretation of the ordinances affecting sewer connections, the Board instituted a policy requiring proof or documentation of any agreements with the Board of Public Works.[6] Documentation could be

be Forty Percent (40%) of the schedule set forth in Section 3 above. (Record 193).

4. Presumably, the developer would recoup his investment when selling lots in the development—the lower tap-in fee as an inducement to potential buyers.

5. City Attorney Allen Hamilton testified that there could be other possible interpretations, but a reasonable interpretation was that once Easley built the sewer, lot owners would be entitled to the forty percent rate by ordinance. City corporate counsel Dave Bunner, who worked on the drafting of the ordinance and was familiar with the ordinance because of his representation involving the sewer department, testified that to deny the forty percent rate would be to deny rights which were vested under the ordinance.

6. Under cross-examination, Leich was shown a copy of the ordinance and asked the following questions:

Q. If this sewer had been extended for improvement into the St. Joe Business Park subdivision more than 150' and if it had been in place and accepted for maintenance after the passage of the 1976 Ordinance which you have before you and which is before the Court and jury and if that improvement was in place and accepted for maintenance by the City of Evansville on the date that I just previously mentioned, that date being October 5, 1977, Mr. Leich, as former President of the Utility Board do you have an opinion as to the legitimacy of Mr. Easley's claim that he should receive a 40% rate for tap in to this sewer?
A. Under the assumptions that I have been given and assuming that there is nothing else of a contradictory nature anywhere else in the Ordinance that would have any bearing on this particular policy it would appear from reading this, that based on this, that he would qualify.
                *    *    *    *    *    *
Q. I will ask you to look at the provisions of Sec. 4b again and tell me whether there is anything in this provision which requires a

provided by a copy of the minutes from the Works Board documenting approval or, if it had not been incorporated in the minutes, a statement from the previous Board that it had been approved.

In July, 1983, Glen Moore purchased a lot in the St. Joseph Business Park and attempted to pay a forty percent sewer connection fee. When it was not accepted, Moore went to see Easley. Easley apparently told Moore he would get him something to prove he was supposed to get the forty percent fee. Easley sent a letter to the Evansville Building Commissioner, dated October 27, 1983, signed by Easley's secretary, Judith Woodall. The letter stated:

Attached is a letter we are expecting to receive from the Board of Public Works. The agreement affects property purchased by Mr. Glen Moore in St. Joseph Avenue Business Park.

(R. 425). Attached to the letter was an unsigned draft of a proposed letter to be signed by Vezzoso. The body of the letter was identical to the December 2, 1981, letter charged in the indictment; however, the 1983 proposed draft did not include spaces for the signatures of the other board members nor did it include the sentence "on Recommendation of Richard Eifler, City Engineer, who was present at said meeting", and it did not have a place for the attestation of Eifler.

Easley appeared before the new Board on December 6, 1983, and presented the following letter (Exhibit 6, the subject of the indictment):

### BOARD OF PUBLIC WORKS

#### City of Evansville

December 2, 1981
Mill Road Office Building Partnership
1133 West Mill Road
Evansville, Indiana 47710
Subject: Sewer Tap-in Fee for Buildings in St. Joseph Avenue Business Park Subdivision
Gentlemen:
This letter is to confirm our agreement concerning the method of determining the amount of the sewer tap-in fee for the buildings that are being constructed in the St. Joseph Avenue Business Park. The Board of Public Works is aware that the sanitary sewer extension on Commercial Court was constructed by the Mill

certification by the Board of Public Works or a statement of policy, agreement, to the effect that the sewer tap in question should have received a 40% reduction?
A. No, there is no such requirement.
Q. Would I be correct, Bob, in saying that the provisions of Sub Sec. 4b are automatic, that they don't require a certification or confirmation by anyone?
A. They do not require a certification.
Q. Had you gone this route, had the Utility Board gone this route, and determined as we have done in our testimony and our conversations here today, that no certification by way of this letter was even necessary because of the provisions of the Ordinance and I am referring to Exhibit 6, had you gone the route of exploring the terms of the actual Ordinance that letter would not even have been required?
A. If this was still the Ordinance in question, I mean in effect at the time of our meeting then, if we had gone that route we probably wouldn't have needed the letter.

\* \* \* \* \* \*

Q. Had Mr. Easley done this under the inducements of this ordinance, the ordinance being a 40% rate and had he put it in place as we have assumed and we expect to prove this, don't you think it would have been an unfair policy by the Board to deny what was actually given to him under the ordinance?
A. Possibly. One of the reasons that went into the merger, one of the things that we wanted to try to do was honor any commitment that had been made to the developers or anyone.
Q. And if these commitments were established by ordinance provisions in the City of Evansville and had you exercised the aspiration of that route, I take it that you would have granted, at least for your part, that sewer rate reduction. Is that correct?
A. Looking at the ordinance, if we had gone that route.
Q. Is there anything invalid about going that route, to go back and look at the ordinance and see what it provides?
A. No. They're reasons why we didn't, but in this case there would have been a route we could have taken, yes.
Q. You said there were reasons why you didn't.
A. Yes.
Q. In this particular case?
A. No, just in general why we didn't adopt that route to look at each of these requests. We took the other route that I indicated.
(R. 255–259).

Road Office Building Partnership at their expense at a time when the Board of Public Works allowed an extension to be constructed with the understanding that the sewer tap-in fee as determined for the lot—based on applicable ordinances and sewer contracts of record.

In a meeting attended by John Vezzoso, Kevin Winternheimer and Andy Easley it was agreed that the 40% tap-in fee policy would remain in effect permanently for any building constructed in this Subdivision. On the recommendation of Richard Eifler, City Engineer who was present at said meeting.

> BOARD OF PUBLIC WORKS
> /s/ John J. Vezzoso, President
> /s/ Steven E. Imes, Vice–President
> /s/ James J. Helfrich, Member
>     (stamped)
> ATTEST:
> /s/ Richard Eifler
> City Engineer

(R. 7, emphasis added).

Board Minutes reveal that the letter was given to the Board's attorney Allen Hamilton,[7] who, after consulting with the City Attorney, reported that the letter agreement was sufficient and recommended approval of the forty percent connection fee. On the basis of the letter, the reduced fee was approved by the Board. Robert Leich and Norbert Wooley, who were on the Utility Board in 1983, testified they would not have granted the forty percent tap-in fee if they had known the letter was not made and signed on December 2, 1981. However, Leich testified that the Board had not been defrauded or denied any sewer tap-in fees as a result of the letter.[8]

At trial, Ronald Duncan, an ink comparison forensic chemist with the FBI, testified that the ink used in the signatures of Vezzoso, co-defendant, and Steven Imes, who was not charged, was not available until sometime after January of 1982. Duncan could *not* date the ink used in Eifler's signature. The rubber stamped signature of James Helfrich could not be dated. Duncan also testified that the ink used in signing another letter (nearly identical to the letter charged in this indictment) dated December 2, 1981, but signed by Vezzoso alone was not available before 1983.

Helfrich, who was not charged and was at the time of the trial the President of the Utility Board, testified that he was on the Board in 1981 for one year. He went off the Board in 1982, but was reappointed in 1983. He further testified that he recalled a meeting in November or December of 1981 regarding the reduced sewer fee for the St. Joseph Business Park and that the discussion was the result of one lot owner, Earl Woodall, threatening to sue if the matter was not straightened out.[9] He further testified that he used a rubber stamp to sign the letter in 1981. The State offered evidence indicating he used a different rubber stamp to sign 1981 utility records than the one he claims to have used in 1981 to sign the letter. A police officer checked utility records and the records were introduced. No charges were filed against Steven Imes and, although he was

---

7. Hamilton had no independent recollection of this action; however, Board minutes indicate he consulted with the City Attorney. The City Attorney at that time would have been Kevin Winternheimer or Dave Bunner.

8. The State concedes that neither the Board nor the City are contending that they have been defrauded of any revenue in this case because they are awaiting the outcome of this appeal before determining whether lot owners were entitled to the reduced fee under the ordinance.

9. Earl Woodall, Easley's partner, testified that there was confusion in 1981 over the tap-in fee for lot # 12 in the Business Park. He contacted the City Attorney's office and talked to Kevin Winternheimer. Woodall further testified that he told Winternheimer he was prepared to file a friendly lawsuit so that lot owners wouldn't have to go through this problem each time they attempted to hook-up to the sewer system. He stated that Winternheimer researched the problem and contacted him with an opinion that lot owners were entitled to the forty percent fee and that he would send a memo to the Sewer Department. Woodall told Easley that they needed to get this matter documented. After that conversation, sewer records indicate that Woodall paid a forty percent tap-in fee for lot # 12 on December 3, 1981, which he suggested is more than a coincidence that that was the day after the alleged fraudulent letter is dated.

listed on the State's witness list, he was never called to testify.

Eifler contends that the evidence is insufficient to uphold his conviction for forgery. Eifler argues that: 1) the contents of the letter were consistent with the law; 2) the Board members and the Board's attorney admitted that they were not defrauded or denied any sewer revenue; and 3) most importantly, there was no evidence that Eifler did not sign the letter on December 2, 1981.

Eifler claims that the testimony of all the witnesses undeniably establishes that a forty percent sewer connection rate is applicable to all owners of lots within the St. Joseph Avenue Business Park who connect into the private sewer extension built by Easley. The court recognized and affirmed the legal entitlement and the forty percent rate during counsels' arguments (outside the presence of the jury) on Eifler's Motion for Directed Verdict:

"COURT: I haven't read all the Exhibits. I think I know pretty much what is in them. Obviously from all the discussion about them, some of them I am familiar with. I am going to take this under advisement. I tell you, I have ... it is very peculiar in the sense that it was impossible for the defendants to literally defraud the board *because under the evidence they were entitled to forty percent rate*, but a board tells them that they have to show a preexisting agreement and, so for these purposes I am assuming they did in fact conspire to create an instrument to satisfy the board is peculiar.... If anybody wants to look for some law on the area of impossibility ... It was impossible for these defendants under the circumstances to ... I don't want to say defraud, because that is too broad a word, but it was impossible to cheat the city or the Sewer Board out of any money." (R. 745–746).

\* \* \* \* \* \*

By the Court: Again, I am making all the assumptions, what you wanted in here is the approval of the board, it wasn't cash, he wanted approval of the board, right?

Mr. Robinson: Yes, but *there is no evidence here that that approval needed to be obtained.*

The Court: *That is the irony, it really didn't need to. For two hundred dollars he could have gone and asked a lawyer and a lawyer would have said, no, you can get it under the law, but for some reason no one did that.*

R. 769–770, (emphasis added). The court denied the motion because it was apparently persuaded by the prosecutor's argument that "even if the Defendants conspired to create a letter that got Easley and other lot owners no more than what they were entitled to under the ordinance, then the Defendants are still guilty." (R. 728–729).

The State contends that the evidence was sufficient because the unlawful act charged was the making of the letter in a manner that purported to show it was made on one day when it really was made on another day and that it was done to mislead the Utility Board into approving the discount for lot owners in the Business Park at a time when the Sewer Department refused to give such a discount.

■ On a claim of sufficiency of the evidence, this court will not reweigh the evidence or judge credibility of witnesses. Circumstantial evidence may be sufficient to support a conviction. It is not necessary that every reasonable hypothesis of innocence has been overcome, but only that an inference which supports the jury verdict may reasonably be drawn. *Collins v. State* (1988), Ind., 521 N.E.2d 682; *Brooke v. State* (1987), Ind., 516 N.E.2d 9. The conviction will be affirmed if there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt. *Taylor v. State* (1973), 260 Ind. 64, 291 N.E.2d 890; *Glover v. State* (1970), 253 Ind. 536, 255 N.E.2d 657. This means that the decision must be based on proven facts and not upon mere guess, conjecture, surmise, possibility or speculation, or an inference upon another inference. *Lewis v. State* (1989), Ind.App., 535 N.E.2d 556. An inference is a process of reasoning by which a fact or proposition sought to be established is deduced as a

logical consequence from other facts, or a state of facts, already proved or admitted. *Id.*

■ Forgery is committed when a person, *with an intent to defraud,* makes or utters a written instrument in such a manner that it purports to have been made 1) by another person, 2) at another time, 3) with different provisions, or 4) by authority of one who did not give authority. IC 35–43–5–2. An intent to defraud involves an intent to deceive and thereby work a reliance and an injury. *Wendling v. State* (1984), Ind., 465 N.E.2d 169.

In the present case, in order to establish that Eifler committed forgery, the State needed to prove that Eifler signed the letter at a date other than it was purported to have been made *and* that he intended to defraud the Board, by misleading the Board into giving a discount on the tap-in fee to which Easley and the other lot owners were *not* entitled. The evidence in this case fails on both counts.

First, even with the ink analysis,[10] there is no evidence that Eifler did not sign the letter on December 2, 1981. The testimony of Ronald Duncan, the expert witness, indicated that the ink in two of the signatures was not available until early January 1982; however, he could not date the ink used in Eifler's signature.

Eifler objected to the admissibility of Duncan's testimony because the process Duncan used to date the ink could not exclude all other manufactures of the ink. Duncan, a Special Agent Laboratory examiner with the FBI in Washington, D.C., testified he took punch marks from the original letter, which he had received from the Evansville City Police Department. He added a solvent to the punch marks to extract a fluorescent tracer tag from the ink, then used thin layer chromotography, a common chemical technique, to analyze the ink. Duncan compared the results to known samples of ink from only one manufacturer of ink, Formulab, Incorporated, of California, which places fluorescent type material in its ink, changing the formula every year. Duncan admitted that there are at least 15–20 other ink manufacturers, but he made no listing of these manufacturers nor had he researched the characteristics of their ink to determine whether they contained similar fluorescent compounds.[11]

We note this type of evidence was held to be unacceptable by a federal court in *United States v. Bruno* (1971 D.Penn.), 333 F.Supp. 570. Bruno was accused of preparing a fraudulent letter dated December 18, 1965, but the government contended the letter was actually prepared between May of 1967 and March 24, 1969. The district court rejected the government's testimony dating the ink in the letter because the expert's ink library did not include ink samples from Japan and it was impossible for the expert witness to exclude inks which he had never examined. The court observed: "Obviously, a procedure which relies entirely on comparison and elimination cannot be used to make a positive identification when an unknown number of inks cannot be excluded." *Id.* at 572. The court's observation applies to the present case as well.

Nevertheless, even if we consider Duncan's testimony, it indicates that the ink could have been available in early January 1982. There was no evidence as to who signed the letter first or who drafted the letter. In fact, the evidence produced at trial indicates that it is possible that Eifler could have signed the letter in December 1981 and that the letter was not signed by the other parties until a later time. This circumstantial evidence is not substantial or probative to establish that the letter was not signed on December 2, 1981, by Eifler. The other evidence presented was circumstantial and negative evidence which called for the jury to speculate. For example, the fact that a similar letter was drafted in

---

10. Eifler challenged the admission of the testimony of the ink expert. Because we reverse on sufficiency of the evidence, we need not determine whether the admission of such evidence was erroneous.

11. Duncan testified he had "probably" tested every ink sample from each and every manufacturer in the United States. (R.396). Inks manufactured outside of the U.S. were not excluded.

1983 permits speculation that the 1981 letter is a copy of the 1983 letter. It is just as reasonable to infer that the 1983 letter was drafted from the 1981 letter.

■ Second, it is clear from the testimony that Easley and the lot owners were entitled to the discount by ordinance, which the present Board refused to follow without proof of the previous Board's agreement. This proof was only required because the new Board for some reason refused to seek a legal interpretation of the ordinances—which had always been the manner in which sewer fees were determined.

■ Intent to defraud is an essential element to sustain a conviction for the crime of uttering a forged instrument. *Reid v. State* (1973), 156 Ind.App. 692, 298 N.E.2d 480. The intent to defraud may be shown by circumstantial evidence. However, such evidence must be sufficient to show that if the instrument had been genuine, it would have had a legal force or effect or the power to impose upon and deceive the board. *Ziss v. State* (1949), 227 Ind. 169, 84 N.E.2d 716. Intent to defraud also involves an intent to deceive and thereby work a reliance and injury. *Wendling, supra.* Intent is a mental function and, absent an admission, it must be determined by courts and juries from a consideration of the conduct and natural and usual consequences of such conduct. *State v. McGraw* (1985), Ind., 480 N.E.2d 552.

State argues that the intent to defraud may be inferred from the making of an instrument purporting to have been made at another time in order to deceive the Board into giving the reduced rate at a time when the Board refused to give such a discount. The State argues that it is not necessary to show that the Board was actually defrauded. The State argues that it is sufficient to show that an instrument was fraudulently made, citing *Jordan v. State* (1987), Ind., 502 N.E.2d 910. In *Jordan,* the defendant obtained items from Hoosier Photo by making an oral representation that he represented James Associates, but he signed the purchase receipt with his own name. The receipt—the written instrument—did not demonstrate that he claimed to sign as a representative of James Associates. The *Jordan* court observed that the express language of the forgery statute focuses on the means by which forgery is accomplished and includes "every act which fraudulently makes an instrument appear what it is not." *Id.* at 913, quoting *Bowman v. State* (1979), Ind.App., 398 N.E.2d 1306.

■ However, we observe that the making of an instrument which purports to have been made at another time is not a crime *unless* it is accompanied by an intent to defraud—that is there must be a potential benefit to the maker or potential injury to the defrauded party. In *Jordan,* the defendant obtained goods to which he was not entitled. In this case, there is no evidence Eifler derived any benefit or could have derived any benefit from deceiving the Board. It is undisputed that there has been no injury. This case is analogous to the circumstances in *McGraw, supra,* where the defendant was employed by the City of Indianapolis as a computer operator and was provided with a personal terminal. The City leased computer services on a flat rate charge so that the expense to it did not vary by the extent to which the services were used. Defendant used a portion of the computer's information storage for maintaining his own personal records in connection with a private sales venture. He was charged and convicted of theft, which requires an intent to deprive another person of use or value of the other's property. This court affirmed the conviction. Our supreme court reversed finding there was no evidence the City was ever deprived of any part of the value or use of the computer. The *McGraw* court held that: "[W]hen the natural and usual consequences of the conduct charged and proved are not such as would effect the wrong which the statute seeks to prevent, the intent to effect that wrong is not inferable." *Id.* at 554. Likewise, in the present case, there is insufficient evidence of an intent to defraud because there was no injury or potential for injury. There may have been deception, but, where there is no

resulting injury or potential for injury, an intent to defraud has not been proven.

Leich testified that if the letter had been dated in 1983 memorializing an agreement made in 1981, the letter would have been acceptable. Even if the letter was written on a date other than December 2, 1981, that alone is insufficient to establish an intent to defraud. To establish fraud, it must be shown that a material misrepresentation of a past or existing fact was made which was untrue and known to be untrue by the party making it or else recklessly made and the other party relied on the representation to his detriment. *Fleetwood Corp. v. Mirich* (1980), Ind.App., 404 N.E.2d 38. In this case, the date on the letter is immaterial. Easley's sewer was constructed at a time when the ordinance was in effect, entitling lot owners to a forty percent rate. Although the date on the letter may have caused the Board to rely on it—instead of the applicable ordinance—the letter could not cause an injury to the Board or the City because the ordinance controlled the sewer rate. We reverse.

CONOVER and GARRARD, JJ., concur.