**John P. OSBURN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 38A04–1004–CR–281.**

Court of Appeals of Indiana.

Jan. 21, 2011.

Transfer Denied March 30, 2011.

Mark Small, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Janine Steck Huffman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

A criminal defendant's wife wrote a check to a bail bondsman to post her husband's bond. The check was written on insufficient funds, and the bondsman told the wife that he would make arrangements to revoke the bond. The bondsman went to the courthouse and asked the bailiff for the bond paperwork, which stated that the bond "should remain a permanent part of court records." The bailiff handed the paperwork to the bondsman, who told the bailiff that he needed the bond back because the check had bounced and walked out the door. The bailiff thought that the bondsman would obtain a good check and return with the bond, but he did not. Instead, he allowed his business partner to write "VOID" on the bond, which was in fact valid, and returned it to the insurance company without paying the $350 premium. The judge presiding over the criminal defendant's case did not learn about the missing bond paperwork until the following month, when the defendant requested a bond reduction hearing because

he had not been released from jail. The bondsman, John P. Osburn, was charged with and convicted of theft, obstruction of justice, and insurance fraud, all as class D felonies.

On appeal, Osburn claims that his convictions are not supported by sufficient evidence. He also claims that his convictions for both theft and obstruction of justice violate Indiana's constitutional prohibition against double jeopardy. We conclude that the State presented sufficient evidence to support Osburn's convictions but that his double jeopardy rights were violated because there is a reasonable possibility that the jury used the same facts to establish the essential elements of both theft and obstruction of justice. Therefore, we affirm Osburn's theft and insurance fraud convictions and vacate his obstruction of justice conviction and sentence on double jeopardy grounds.

### Facts and Procedural History

The facts most favorable to the jury's verdict indicate that in September 2009, Travis Pfeifer was incarcerated in Jay County for criminal charges filed in Jay Superior Court. Travis was also wanted for a probation violation in Adams County. Jay Superior Court Judge Max Ludy, Jr., set Travis's bond at $7000.

On the evening of September 16, 2009, Travis's wife, Rebecca, went to Osburn's bail bonding agency, which he owned and operated with his wife, Dee. The Osburns were agents of United Surety Agents Incorporated ("USA"), which is an agent of Vernon General Insurance Company ("Vernon General"). Dee told Rebecca that it would cost $705 to post bond for Travis: $700 for the bond premium and $5 for the filing fee. Pursuant to contract, USA would receive half the premium on a bond written by one of its agents, retain a commission, and forward the remainder to

Vernon General. Rebecca wrote Dee a check and filled out the bond paperwork, which typically consists of two documents: (1) an appearance bond form, which is signed by the defendant and accepted by the jail authorities; and (2) a power of attorney ("POA"), which is essentially a check that the court cashes if the defendant fails to appear. Pursuant to a hold-harmless agreement with Vernon General, USA would have been liable on the bond in the event of a failure to appear. Dee signed the POA as attorney in fact for Vernon General. The POA contains the following advisement in red print: "Powers of Attorney must not be returned to attorney-in-fact, but should remain a permanent part of court records." State's Ex. 2.[1] At some point, the bond paperwork was delivered to the Jay County Sheriff's Department and then to Jay Superior Court.

When Dee attempted to deposit Rebecca's check the next morning, the bank teller told her that the check was written on insufficient funds.[2] Dee contacted Rebecca, who went to "Osburn's office and asked him if there was anything we could do to fix this where I do not go to jail and he does not go to jail." Tr. at 44.[3] Osburn told Rebecca that she needed to pay a $55 fee "to revoke Travis'[s] bond so he

would not be taken to Adams County." *Id.* Rebecca did not have $55 at that time, but Osburn told her that she could pay him the following Monday, which she did. Osburn then told Rebecca that "he was going over to the courthouse to file papers to revoke [Travis's] bond." *Id.* at 45.

Osburn went to the office of Jay Superior Court bailiff Brenda Sudhoff. Osburn asked to see the paperwork on Travis's bond. Sudhoff "located the paperwork and handed him the bond so he could look at it." *Id.* at 61. Osburn told Sudhoff that "he needed the bond back because the check had bounced" and "basically turned around and walked out the door." *Id.* at 62. Sudhoff assumed that the "person whose check bounced would bring a new check in and [Osburn] would bring the bond back." *Id.* Rebecca never brought in a new check, and Osburn never returned the bond. Instead, with Osburn's approval, Dee wrote "VOID" on the POA, which was submitted to USA. According to USA owner Les Sebring, USA recorded the bond as a voided bond, i.e., as a bond that "had [n]ever been written" and "was never filed." *Id.* at 101. In fact, the bond was valid because it had not been properly revoked. *See id.* at 79, 102 (testimony of Judge Ludy and Sebring).[4] Neither USA

1. The trial transcript indicates that the advisement is printed in red on the original POA. Tr. at 133. The copy of the POA in the exhibits volume submitted on appeal is printed entirely in black.

2. According to Rebecca, she had obtained a $1300 online loan in Travis's name that was revoked when the lender discovered that Travis was incarcerated. Tr. at 43–44.

3. It is unclear whether the "he" Rebecca referred to is Travis or Osburn.

4. Judge Ludy testified that
 once the bail bond was written and taken by the Sheriff and given to Ms. Sudhoff it was just the same as if the thing had been

filed in open court. Then, if the person who's guaranteeing the bond, for whatever reason, no longer wants to be on the bond, he has to follow certain procedures. He has to go to the Clerk's office, get a certified copy of the written undertaking and a copy of the arrest warrant and then deliver the defendant and those two documents, which have been certified by the Clerk, to the Sheriff and then the Sheriff has to file a written receipt or written acknowledgement that the defendant has been surrendered. Well when the bond is not in the file you can't go to the Clerk's office and get a certified copy of the bond. Ok, then the next thing that has to happen is that once the person has been surrendered, the ques-

nor Vernon General received a premium for the bond, and Travis remained incarcerated in the Jay County jail.

Judge Ludy did not become aware that Osburn had taken Travis's bond paperwork until October 27, 2009, when he received Travis's request for a bond reduction hearing and Sudhoff wondered aloud if Travis's "check [would] bounce again." *Id.* at 63. Judge Ludy asked Sudhoff what she meant, and she told him what had happened on September 17.

A criminal investigation ensued, and Osburn was charged with theft, obstruction of justice, and insurance fraud, all as class D felonies. On March 25, 2010, a jury found Osburn guilty as charged. The trial court entered judgment of conviction and sentenced Osburn to concurrent terms of two years on each count, with all but ninety days suspended to probation. Osburn now appeals.

### Discussion and Decision

### I. Sufficiency of Evidence

Osburn contends that his convictions are not supported by sufficient evidence. Our standard of review in well settled:

Upon review of a claim of insufficient evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. We will affirm a conviction unless, considering only the evidence and reasonable inferences favorable to the verdict, we conclude that no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. Instead, the evidence is sufficient if an inference may reasonably be drawn from it to support the jury's verdict. *Stokes v. State,* 922 N.E.2d 758, 763 (Ind. Ct.App.2010) (citations omitted), *trans. denied.*

### A. Theft

The State alleged that Osburn committed class D felony theft by knowingly exerting unauthorized control over the property of Jay Superior Court, namely the POA, with the intent to deprive the court of any part of its value or use. Appellant's App. at 7 (charging information); *see also* Ind.Code § 35–43–4–2(a). Osburn contends that his exertion of control over the POA was authorized because Sudhoff allowed him to leave her office with it and "did not report a theft that day." Appellant's Br. at 10. Osburn's argument disregards the advisement in red print on the POA itself that it "must not be returned to [the] attorney-in-fact, but should remain a permanent part of court records," as well as Judge Ludy's testimony that court employees are not authorized to return bond paperwork to bail bondsmen. State's Ex. 2; Tr. at 81. Given that Osburn wrote bonds for a living, it was reasonable for

---

tion comes about, now that he's surrendered does he get his premium back or does the bail company or the bail agent get exonerated from the bail or from the bond. In order to ... do that then the bail agent has to file a copy of the bond and the warrant with the court, along with a petition, asking to be exonerated for whatever reason. Then, there has to be notice given to the Prosecuting Attorney, at least three days prior to the hearing. The hearing is held, depending on the facts of the situation and the case is, either the person is taken off the bond without having to refund the premium or the person is just simply exonerated from the bond and not required to refund the premium.

Tr. at 77–78; *see also* Ind.Code §§ 27–10–2–5 and –6 (governing surrender of defendants and exoneration of sureties). Sebring testified that if a bail bondsman receives a bad check, he "either pursues the bad check writer in civil court to collect the premium or he goes to the court and asks the court to be released from the bond because the check was bad, he didn't really get paid." *Id.* at 19.

the jury to conclude that he knew that his exertion of control over the POA was unauthorized, notwithstanding Sudhoff's acquiescence. In sum, the State presented sufficient evidence to support Osburn's theft conviction.[5]

## B. Obstruction of Justice

■ The State alleged that Osburn committed class D felony obstruction of justice by altering, damaging, or removing the POA with the intent to prevent the POA from being produced or used as evidence in an official proceeding or investigation. Appellant's App. at 7 (charging information); *see also* Ind.Code § 35–44–3–4(a)(3). Osburn asserts that nothing in the record indicates that the POA could have been used as evidence in Travis's criminal case. Osburn overlooks the abundant evidence indicating that he removed the POA from the court's files with the intent to prevent the POA from being produced in Travis's case to release him from the Jay County jail.[6] This evidence is sufficient to support Osburn's conviction for obstruction of justice.

## C. Insurance Fraud

In alleging that Osburn committed class D felony insurance fraud, the State asserted that he

did knowingly and with intent to defraud present, cause to be presented, or prepared with knowledge *or* belief that it would be presented to *or* by an insurer a written statement that [Osburn] knew contained materially false information as part of, in support of, or concerning a fact that was material to premiums paid on an insurance policy, to-wit: writing void Power of Attorney No. VBE–008173, [Osburn] did knowingly and with intent to defraud, conceal information concerning the premiums paid on an insurance policy. . . .

Appellant's Br. at 12 and Appellee's Br. at 11;[7] *see also* Ind.Code § 35–43–5–4.5(a)(2)(C).

This charge is clumsily worded, to say the least. In his opening statement, the prosecutor explained it to the jury as follows:

ber 16, 2009 until it's, basically his bond was revoked or the bail company was exonerated then on November the 19th.

. . . .

. . . . It created another problem in that [Travis] had a hold on him from the Adams Superior Court for some sort of probation violation or something of that nature. Technically he was on bond in my court from . . . September 16th through November the 19th. I wasn't quite sure what to do with the fact that he was on bond and whether we should or shouldn't credit him that time or whether Jay County was holding him for Adams County at Jay County's expense or whatever. . . .

Tr. at 79–80. Osburn does not challenge either the veracity or the legal accuracy of Judge Ludy's testimony.

---

5. Osburn makes much of the fact that Sudhoff had not yet recorded the court's receipt of Travis's bond paperwork in the chronological case summary, but he cites no authority for the proposition that a bail bondsman is authorized to remove a POA from a court's records at that (or any) point.

6. Judge Ludy testified as follows:

The bond had been written and it makes no difference to the court whether or not [Travis] did or didn't pay Mr. Osburn or the bonding company, that bond was valid. That was a valid bond. I wasn't aware of it because it had been taken. We also couldn't follow the proper procedures because the bond simply wasn't there and until I became aware of it [the prosecutor's office] got the bond tracked down. We find out what happens only then can the proper procedures be followed. And in the mean time [sic], technically, [Travis] is on bond out of the Jay Superior Court since Septem-

7. Both Osburn and the State quote from and cite to page 7a of Osburn's appellant's appendix, which we were unable to find in the record before us.

[T]here are a couple of options that a bondsman has when a bad check is written. One is to revoke, properly, the bond, put the person back in jail. The other one is, keep the person out on bond and collect on the bad check and go back on the person that wrote you the bad check. Just like in business if somebody writes you a bad check, go sue them right. [Osburn] didn't do that because the evidence will show that he needed to pay a premium to the insurance company. He owed them some money and that money you know, had to come from someone and that piece of paper that he got from Rebecca Pfeifer was worthless so where do you think the money was going to come from. So the evidence will show you that I believe that Mr. Osburn took that bond paperwork and wrote void on it, sent it back to the insurance company. Mr. Sebring will tell you that when that happens they assume that no bond was ever written. Nothing you know, that was just a mistake, a typo, something like that and they replace it. When in fact ... Mr. Sebring will tell you that that was a valid bond. That Mr. Pfeifer was in fact out on bond in that case. That was a contract in an essence [sic]. A contract of insurance and that Mr. Osburn then owed money to the insurance company for that, owed a premium and his marking up, marking void was his attempt to avoid paying a premium to the insurance company. Mr. Sebring will tell you that they never did receive an insurance premium. . . .

Tr. at 11. The prosecutor offered a similar explanation during closing argument. *See id.* at 161 ("This is a false statement folks. Void. False statement in connec-

tion with insurance premiums paid. Testimony undisputed. Never paid a premium to Vernon General. Never paid them any money.").

■ Osburn did not specifically disagree with the prosecutor's explanation of the charge at trial, and he has not attacked the charge as unconstitutionally vague. On appeal, he contends that he did not commit insurance fraud because he did not receive a premium for the bond. To the extent Osburn argues that the State alleged and failed to prove that he committed insurance fraud by concealing his receipt of a premium payment from Rebecca, such an argument is both tardy and unavailing. *See Hape v. State,* 903 N.E.2d 977, 997 (Ind.Ct.App.2009) (stating that defendant may not raise argument for first time on appeal), *trans. denied.* By submitting the POA marked "VOID" to Vernon General's agent, USA, Osburn concealed the fact that the bond was actually a valid bond—a fact that he does not dispute on appeal— for which he owed USA a $350 premium that was never paid.[8] The jury was free to draw the eminently reasonable inference that Osburn did so knowingly and with intent to defraud. *See* Ind.Code § 35–41–2–2(b) ("A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so."); *Eifler v. State,* 570 N.E.2d 70, 76 (Ind.Ct.App.1991) ("An intent to defraud involves an intent to deceive and thereby work a reliance and an injury."), *trans. denied.* Based on the foregoing, we affirm Osburn's conviction for insurance fraud.

### II. Double Jeopardy

■ Article 1, Section 14 of the Indiana Constitution reads in pertinent part, "No

---

8. The evidence at trial established that Dee wrote "VOID" on the POA, with Osburn's approval. Tr. at 116, 135. Osburn does not contend that his conviction should be reversed on this basis.

person shall be put in jeopardy twice for the same offense." Osburn contends that his convictions for theft and obstruction of justice violate double jeopardy principles. His argument is confusing, but he appears to assert that these convictions violate the Indiana Constitution by virtue of the actual evidence test first enunciated by our supreme court in *Richardson v. State*, 717 N.E.2d 32 (Ind.1999).[9]

 In *Richardson*, the court explained that

[t]o show that two challenged offenses constitute the same offense under the actual evidence test, "a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense."

*Spivey v. State*, 761 N.E.2d 831, 832 (Ind. 2002) (quoting *Richardson*, 717 N.E.2d at 53). "The [defendant] must show more than a remote or speculative possibility that the same facts were used. To determine what facts were used, we consider the evidence, charging information, final jury instructions, and arguments of counsel." *Goldsberry v. State*, 821 N.E.2d 447, 459 (Ind.Ct.App.2005) (citation omitted).

In *Spivey*, the court made the following clarification:

The language expressing the actual evidence test explicitly requires evaluation of whether the evidentiary facts used to establish the essential elements of one offense may also have been used to establish *the essential elements* of a second challenged offense. The test is *not*

merely whether the evidentiary facts used to establish *one* of the essential elements of one offense may also have been used to establish *one* of the essential elements of a second challenged offense. In other words, under the *Richardson* actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense.

*Id.* at 832–33.

 To reiterate, the State alleged that Osburn committed theft by knowingly exerting unauthorized control over the POA, with the intent to deprive the court of any part of its value or use. Appellant's App. at 7 (charging information); *see also* Ind. Code § 35-43-4-2(a). The State alleged that Osburn committed obstruction of justice by altering, damaging, or removing the POA with the intent to prevent the POA from being produced or used as evidence in an official proceeding or investigation. Appellant's App. at 7 (charging information); *see also* Ind.Code § 35-44-3-4(a)(3).

Osburn asserts that the State alleged that he "committed theft and obstruction of justice, respectively, by having removed the same documents from the Jay Superior Court office at the same time" and that it used the same facts to establish the essential elements of both offenses. Appellant's Br. at 14. In response, the State observes that the charging information alleged that Osburn committed obstruction of justice by altering, damaging, *or* removing the

9. Osburn also mentions the federal double jeopardy clause and corresponding test for double jeopardy violations but fails to develop an argument in this regard. Consequently, any federal double jeopardy claim is waived. *Cf. Jackson v. State*, 925 N.E.2d 369, 372 n.1

(Ind.2010) (finding appellant's state double jeopardy argument waived because of his failure to "provide any authority or argument supporting a separate standard under the Indiana Constitution").

POA and that the evidence established that he altered the POA by writing "VOID" on it. Thus, the State argues, there is no double jeopardy violation because "the evidentiary facts establishing the elements of each offense were different." Appellee's Br. at 15.

Our review of the record, however, indicates that the jury likely used the same facts to convict Osburn of both theft and obstruction of justice. In closing argument, the prosecutor summarized the evidence supporting the charges for theft and obstruction of justice in pertinent part as follows:

> Did [Osburn] knowingly exert unauthorized control over that paperwork. I submit to you that was pretty clear too.... Did Mr. Osburn intend to deprive the court of it's [sic] use or value. Clearly. Why else would he take it. I asked him after he said no that's not what I did, I believe he did eventually say yeah I didn't want it to be used in a criminal case. That's why I took it. Clearly he didn't want the court to have it because he'd be liable for it....

> The second count, obstruction of justice. Similar but different to theft [sic]. And that has some elements too.... Did [Osburn] alter, damage or remove a record, document or thing.... Clearly it's been altered. *Even more clearly by Mr. Osburn's own admission it was removed.* He took it. He left the court with it. He never brought it back. Why, because he didn't want the court to use it in the State versus Travis Pfeifer official proceeding, a criminal investigation. That's why he took it.

Tr. at 158–60 (emphasis added). Given the prominence that the prosecutor placed on Osburn's removal of the POA with respect to the obstruction of justice charge, we conclude that there is a reasonable possibility that the jury used the same facts to establish the essential elements of both theft and obstruction of justice. Therefore, we vacate his conviction and sentence for obstruction of justice on double jeopardy grounds. In all other respects, we affirm.

Affirmed in part and vacated in part.

BAKER, J., and KIRSCH, J., concur.