

**FILED**

Jul 23 2018, 6:18 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert Carr, III,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 23, 2018

Court of Appeals Case No.
18A-CR-286

Appeal from the Marion Superior
Court

The Honorable Kurt Eisgruber,
Judge

Trial Court Cause No.
49G01-1611-F3-45688

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Robert Carr was found guilty of criminal confinement while armed with a deadly weapon, a Level 3 felony; battery resulting in serious bodily injury, a Level 5 felony; and escape, a Level 6 felony, among other offenses. The trial court entered judgment of conviction for the confinement, battery, and escape offenses only and sentenced Carr to an aggregate sentence of fifteen years in the Indiana Department of Correction. On appeal, Carr argues that the admission of a prior statement made by the victim to a law enforcement official violated his Sixth Amendment confrontation rights. Carr also argues that the statement constituted inadmissible hearsay. We conclude that Carr forfeited his Sixth Amendment right to confrontation regarding the prior statement due to his own wrongdoing. In addition, we conclude that the statement was admissible under the hearsay exception to the Indiana Rules of Evidence permitting the admission of a prior statement where the defendant wrongfully caused the declarant's unavailability for trial. Thus, we affirm.

# Facts and Procedural History

[2] On November 18, 2016, Haley Price and her housemate, S.G., held a party with friends at their home on South Dequincy Street in Indianapolis. Carr and S.G. had dated and had previously lived together. However, Carr had not been invited to S.G.'s home that evening.

[3] Carr, who was on house arrest and wore an ankle monitoring device, went to S.G.'s parents' home looking for S.G. When S.G.'s parents informed him that S.G. was not there, Carr went to Price's home. Price's grandmother let Carr in the home when he arrived during the party, and he proceeded to the basement where he found S.G. with the other party attendees. Carr was in the basement for two to three minutes before he asked S.G. to come outside to help him with something. S.G. left the basement with Carr.

[4] Approximately twenty minutes later, Dakota Burgess drove up to the home and saw S.G. lying on the ground in a puddle, unresponsive. Burgess saw someone he could not identify climb into a car and quickly drive away. At the same time that Burgess arrived, Price's grandmother looked out the front door and saw Carr, who was bent down, get up with something in his hand. Carr got into his car and drove away rapidly. There was no one else around apart from Burgess and Carr when Price's grandmother looked out the front door.

[5] Price called 9-1-1. During the 9-1-1 call, S.G. can be heard identifying "Robert" as the person who had stabbed her in the eye. Confidential Exhibits, Exhibit 3 at 2:59-3:19. When paramedics arrived, they found S.G. in critical condition. She was covered in blood, having sustained a stab wound to her left eye, a complex orbital fracture caused by a fist or a kick, and lacerations above her clavicle and on the posterior of her left thigh. S.G. was transported to the hospital for treatment. At the hospital, Detective Tobi Cobain took a statement from S.G. in which S.G. identified Carr as the person who held her in his vehicle while armed with a steak knife and stabbed her in her left eye with the

same knife. Confidential Exs., Ex. 18 at 4-7. After interviewing Price, Burgess, and S.G., Detective Cobain concluded probable cause existed to arrest Carr.

[6] On November 28, 2016, the State charged Carr with a number of offenses, including criminal confinement while armed with a deadly weapon, a Level 3 felony; battery resulting in serious bodily injury, a Level 5 felony; and escape, a level 6 felony.[1] On December 27, 2016, the trial court entered a no-contact order that prohibited Carr from having contact with S.G.:

> in person, by telephone or letter, through an intermediary, or in any other way, directly or indirectly, except through an attorney of record . . . .

> This provision shall also be effective even if the defendant has not been released from lawful detention.

> * * *

> This Order remains in effect until this case has been tried and the Defendant has been sentenced if found guilty.

Appellant's Appendix, Volume II at 75-77 (emphasis omitted). Carr's trial was set for September 11, 2017. In March of 2017, Carr began sending letters to S.G. in which he apologized to her. On April 28, 2017, Carr's second attorney, Robert Alden, deposed S.G. The deposition was recorded but not transcribed.

---

[1] Carr does not appeal his conviction for escape.

After taking S.G.'s deposition, Alden informed Carr that S.G. was "on board" and mentioned plea negotiations. Transcript, Volume II at 149. Carr rejected the possibility of a guilty plea. Carr then filed a notice of intention to plead insanity and underwent a competency review.

[7] S.G. cooperated with the prosecutor through May of 2017 by staying in contact and participating in discovery. Between May 25, 2017, and May 30, 2017, Carr made a series of telephone calls from jail. On May 25, 2017, Carr discussed the fact that he had offered S.G. $20,000 if she needed help and stated, "I'm not giving up," when it appeared that she did not accept it.[2] Confidential Exs., Ex. 101 at Call 2. On May 26, 2017, Carr stated in a telephone conversation,

> I have to fill you in because *she's gonna call you because I told her I was going to give her some of the money from my Auntie. She's gonna help me out for that cash bro*… She's gonna call you and you just gotta play along…She's gotta clear everything up. Once she does that I'm gonna be outta here. This is gonna get me outta jail. This is gonna clear everything up…I told her I got this $20,000 – but I don't have the whole thing…

*Id*. at Call 18 (emphasis in original). In a May 27, 2017, telephone call with S.G., she expressed her desire to see him go to trial and serve some time. Carr told S.G. to, "take the police out of this," and that, "If you do this for me – I'm gonna - like I said I got that 20 grand." *Id*. at Call 20. In a second call that day,

---

[2] The audio recordings of these calls are not part of the record on appeal. A written summary of the calls was admitted at the evidentiary hearing in this matter without objection.

Carr told S.G. that, "All it would take is you to say that you don't want this, that you want to keep it in the streets. That everything they say happen didn't happen." *Id*. at Call 21. In a third call that day, Carr directed S.G. to say that she really did not feel like he had kidnapped her and that she should contact his uncle for some money. S.G. replied that she would consider it. On May 28, 2017, Carr again spoke with S.G. and expressed his hope that she had been thinking about what they had discussed. The next day, Carr told S.G. that his parents will help her financially but that they wanted to be sure that they could trust her to be loyal to Carr. S.G. told Carr that she would wait until after the trial to write him, and Carr replied that "they're trying not to go to trial." *Id*. at Call 38. On May 30, 2017, S.G. told Carr that the first thing she wanted to do when he was out of jail is "make love." *Id*. at Call 43.

[8] On June 17, 2017, Carr's uncle left a message for S.G. on her father's cell phone that Carr had wanted him to contact her. Confidential Exs., Ex. 103 at :26-:27. Carr's uncle communicated to S.G. that Carr offered to allow her the use of Carr's vehicle, Carr would ask his mother to give her a couple hundred dollars, and that Carr said that she could stay at his father's home. *Id*. at :33-:51. S.G.'s father believed that S.G. ceased cooperating with the prosecutor after receiving this voicemail. Between June 26, 2017, and September 13, 2017, Carr placed

384 calls to S.G., forty-six of which were completed. Carr continued to speak to S.G. about changing her story and about not going forward to trial.[3]

[9] At the beginning of August, after Carr was found to be competent to stand trial and plea negotiations had lapsed, the parties began final preparations for trial. The prosecutor requested that defense attorney Alden turn over S.G.'s April 28 deposition. Alden did not immediately tender the deposition to the State, believing that he had an ethical conflict which prevented him from doing so. While Alden was aware that a State motion to compel production of the deposition was at least pending with the trial court, Alden met with Carr's family and explained that, if S.G. did not appear for trial, her deposition could be used against Carr at trial. Carr's father asked to take the deposition home so that he could listen to it with family members. Alden provided the audio recorder which held the only copy of the deposition to Carr's father.

[10] From September 4, 2017, to September 9, 2017, Carr, his father, and his mother had several telephone conversations about the deposition that was then in the family's possession. Confidential Exs., Ex. 105. These calls from jail were recorded. After talking about the upcoming trial, Carr's father expressed his hope that "people keep their word." *Id.*, Call 2 at 9:28. The next day, Carr spoke with his mother about his view that the case was "cut and dry" if S.G. did not come to court. *Id.*, Call 3 at 7:35-8:20. Carr wanted his lawyer, Alden,

---

[3] Audio recordings of these calls were not admitted into evidence. The characterization of the content of these calls was provided by the prosecutor during the evidentiary hearing at trial without objection.

to tell them if the deposition could be used to convict him if S.G. did not come to trial. *Id.*, Call 3 at 10:24-10:30. He expressed his opinion that the prosecutor had no other evidence against him if S.G. did not testify. *Id.*, Call 3 at 11:30-11:35.

[11] On September 5, 2017, Carr's father told Carr that he had listened to the audiotape of S.G.'s deposition and had given it to "Aunt Pat" who had taken the audio recording with her to Chicago. *Id.*, Call 5 at 2:34-2:55. Carr's father speculated that the prosecutor might be angry because the audio recording might not be available for trial. *Id.*, Call 5 at 3:13-3:22. Carr's father planned to consult with a friend to determine how the deposition could be used and "find out before we give it back to [Alden]." *Id.*, Call 5 at 9:04-9:06. They discussed the fact that the prosecutor had to have either a live witness, a deposition, or both to convict Carr. *Id.*, Call 5 at 13:00-13:10. During a second call that day, Carr's father told Carr that the family would not return the deposition to Alden and that, "if they want depositions and all that, they can pay for it their damn selves," to which Carr responded, "Right." *Id.*, Call 6 at 9:15-9:19. When Carr's family returned the audio recorder with S.G.'s deposition to Alden, the deposition had been erased. Depositions of other clients of Alden's were on the audio recording device, but only S.G.'s deposition was missing. It was not possible to accidentally erase recordings on Alden's recording device.

[12] S.G. did not appear for a bail review hearing on September 7, 2017. Carr's September 11, 2017, trial date was continued due to his counsel withdrawing from the case. Carr's jury trial was reset for January 2 and 3, 2018. On

November 14, 2017, the State personally served S.G. with a subpoena to appear for Carr's jury trial on January 3, 2018. Exhibits, Ex. 100. The State served S.G. with the subpoena when she was at a meeting at the Hamilton County Prosecutor's office about another case because she had not responded to the prosecutor's attempts to contact her regarding the instant case.

[13] Carr's jury trial commenced on January 2, 2018. S.G. did not appear to testify on January 3, 2017, the day for which she had been subpoenaed. The State moved to admit S.G.'s hospital statement to Detective Cobain, arguing that it was admissible due to Carr having procured S.G.'s absence from trial through wrongdoing. The trial court held a hearing outside of the presence of the jury during which it heard evidence from Detective Cobain, a deputy prosecutor involved in another case involving Carr, S.G.'s father, and former defense counsel Alden. Alden verified that the content of S.G.'s deposition and her statement to Detective Cobain was essentially the same.

[14] The State represented that it had been attempting to locate S.G. for the month and a half preceding trial by placing multiple telephone calls to the number where Carr had successfully reached S.G. during the summer, which was also the last telephone number S.G.'s parents had for her. S.G. did not return the State's telephone calls. The State had remained in contact with S.G.'s parents, but they had no contact with S.G. either. After the first day of trial recessed, Detective Cobain attempted unsuccessfully to locate S.G. at her last known address in order to serve her with a second trial subpoena for January 3, 2018. Detective Cobain also went to an apartment complex where S.G. had

previously lived but was unable to locate S.G. there either. The trial court enumerated several rationales for admitting S.G.'s statement to Detective Cobain into evidence, including that S.G. was unavailable to testify and that Carr had contributed to the wrongdoing that led to her being unavailable. In her statement, S.G. identified Carr as the person who had held her in his car while holding a knife and who had stabbed her in her left eye with the knife. The jury found Carr guilty of criminal confinement with a deadly weapon and battery resulting in serious bodily injury, among other offenses. Carr now appeals his convictions.

## Discussion and Decision

[15] On appeal, Carr argues that the admission of S.G.'s statement violated his Sixth Amendment confrontation rights and that the trial court abused its discretion when it admitted S.G.'s statement pursuant to a hearsay exception. The analysis of confrontation clause violations and exceptions to the hearsay rule are separate inquiries. *See Holmes v. State*, 671 N.E.2d 841, 859 (Ind. 1996) (noting that the confrontation rights guaranteed by our federal constitution and exceptions to the hearsay rule are analyzed separately), *abrogated on other grounds by Wilkes v. State*, 917 N.E.2d 675 (Ind. 2009). We address these issues in turn.

# I. Sixth Amendment Confrontation Rights

## A. Standard of Review

[16] Carr first argues that the admission of S.G.'s statement to Detective Carr violated his Sixth Amendment confrontation rights. In general, a trial court has broad discretion in ruling on the admissibility of evidence, and we disturb a trial court's evidentiary rulings only upon an abuse of that discretion. *Speers v. State*, 999 N.E.2d 850, 852 (Ind. 2013), *cert. denied*, 134 S.Ct. 2299 (2014). However, when a defendant contends that a constitutional violation has resulted from the admission of evidence, the standard of review is de novo. *Id.*

## B. Right to Confrontation of Witnesses

[17] The Sixth Amendment's Confrontation Clause provides in relevant part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This right precludes the admission of any out-of-court statement that is testimonial in nature if the declarant is not unavailable and the defendant has not had the opportunity to cross-examine the declarant. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004). However, a defendant may forfeit his right to confrontation where his own wrongdoing caused the declarant to be unavailable to testify at trial. *Id.* at 62 (relying on *Reynolds v. United States*, 98 U.S. 145, 158-59 (1878)). The forfeiture by wrongdoing doctrine protects the integrity of the judicial process. *See Davis v. Washington*, 547 U.S. 813, 833 (2006) (noting that "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses

and victims, the Sixth Amendment does not require courts to acquiesce"). In order for a defendant to have forfeited his confrontation rights by wrongdoing, the defendant must have had in mind the particular purpose of making the witness unavailable. *Giles v. California*, 554 U.S. 353, 367 (2008). The Supreme Court has not spoken directly on the burden of proof for showing forfeiture by wrongdoing. However, it has noted that federal courts applying Federal Rule of Evidence 804(b)(6), which codified the doctrine, have applied a preponderance of the evidence standard. *See Davis*, 547 U.S. at 833.

[18] Here, we need not decide whether S.G.'s statement was testimonial or whether she was unavailable for Confrontation Clause purposes because, regardless of those issues, Carr had no prior opportunity to cross-examine her on the statement that was actually admitted at trial. The State argues that Carr's right to confront S.G. was satisfied when defense counsel deposed her under oath on April 28, 2017. Brief of Appellant at 19. However, in order to satisfy the requirement of cross-examination, a defendant must have had the opportunity to cross-examine the declarant on the statement that was actually admitted at trial. *See Howard v. State*, 853 N.E.2d 461, 469 (Ind. 2006) (recognizing, post-*Crawford*, the validity of the rule that the Confrontation Clause is satisfied if the defendant had the opportunity to confront the witness when the testimony was originally given.)

[19] Nevertheless, we conclude that Carr forfeited his right to confront S.G. on her statement to Detective Cobain because his own wrongdoing procured S.G.'s absence from trial. The State showed that Carr began contacting S.G. in

violation of the trial court's no-contact order as early as March of 2017. S.G. continued to cooperate with the prosecutor by staying in contact and by participating in discovery. After Alden deposed S.G. in April of 2017, Carr knew that S.G. was still cooperating with the prosecution, but he informed Alden that he had decided to reject any plea agreement offered by the State. Thus, Carr sought an alternate resolution to his case.

[20] In May of 2017, Carr offered S.G. $20,000 and later stated on the telephone that "She's gonna help me out for that cash bro…" Confidential Exs., Ex. 101 at Call 18. Although S.G. initially expressed her desire that Carr serve executed time for the offenses, after repeated calls from Carr about financial assistance and changing her story, S.G. was considering Carr's offers. Carr eventually told S.G. that he was trying not to go to trial. S.G. apparently softened her stance toward Carr, as she offered to have sexual relations with him. Around this time, S.G. ceased cooperating with the prosecutor.

[21] In addition, on June 17, 2017, Carr's uncle left a voicemail message for S.G. on Carr's behalf offering her the use of a car, cash, and a place to stay. S.G.'s father felt that this message caused S.G. to refrain from cooperating with the prosecutor. Between June 26 and September 13, 2017, a period that encompassed Carr's first trial setting, Carr telephoned S.G. on 384 occasions and spoke to her forty-six times about either changing her story or not participating in the trial. Carr's discussions with his father and mother concerning the erasure of S.G.'s deposition showed that a plan was afoot to prevent Carr's conviction which was contingent on S.G. not appearing for trial.

Although we do not impute the erasure of the deposition to Carr, these discussions were probative of Carr's intent when he was contacting S.G. so intensely in violation of the no-contact order. In November of 2017, S.G. was still out of contact such that the prosecutor was forced to serve her with a trial subpoena at the Hamilton County Prosecutor's office. We conclude that the preponderance of the evidence showed that Carr's offers to S.G. of money, a car, and a place to stay were part of an intensive campaign on his part to convince S.G. not to appear at his trial and that the evidence supports a reasonable inference that this campaign was the reason why S.G. did not appear.

[22] On appeal, Carr argues that certain calls made by him only discussed a second case involving S.G., and he suggests that S.G. chose not to testify against him because she was in love with him. Br. of Appellant at 16-17. We find Carr's arguments unpersuasive because at the time the calls at issue were placed, both cases were pending, and there was ample evidence in the record that Carr desired that S.G. not testify in this case. Carr's argument finding fault with the trial court's evidentiary ruling, *see id.* at 18-19, ignores the fact that we have conducted a de novo review of the evidence in this case and reached our conclusion independently from the trial court's reasoning. *Speers*, 999 N.E.2d at 859. Because Carr forfeited his right to confront S.G. on her statement by his own wrongdoing, his Sixth Amendment rights were not violated by the admission of her prior statement at trial.

# II. Hearsay Exception

[23] Carr also argues that the trial court abused its discretion when it admitted S.G.'s statement because the State did not establish an adequate evidentiary foundation for its admission as an exception to the hearsay rules. We will reverse a trial court's ruling on hearsay only upon an abuse of discretion. *Ikemire v. State*, 852 N.E.2d 640, 644 (Ind. Ct. App. 2006), *trans. denied*. We will affirm the trial court's evidentiary ruling on any basis supported by the record. *Id*.

[24] S.G.'s prior statement constituted hearsay. She did not testify at trial, and it was offered into evidence without any limiting instruction and so was offered to prove the truth of the matters it contained. *See* Ind. Evidence Rule 801(c). Hearsay is not admissible unless the Rules of Evidence or other law provides otherwise. Evid. R. 802.

[25] Evidence Rule 804 provides the following exception:

> (b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness.
> . . .
> (5) A statement offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness for the purpose of preventing the declarant from attending or testifying.

A declarant is considered to be unavailable as a witness if the declarant is absent from trial and the proponent of the statement has been unable to procure

the declarant's attendance at trial by process or other reasonable means. Evid. R. 804(a)(5)(A). In applying Evidence Rule 804(b)(5), we have looked to Federal Evidence Rule 804(b)(6), after which our rule was patterned, and at caselaw construing that rule for guidance and have concluded that the State must only show that the defendant was motivated at least partially by a desire to silence the witness with his wrongdoing. *See White v. State*, 978 N.E.2d 475, 479-80 (Ind. Ct. App. 2012), *trans. denied*. The State was required to establish the exception by a preponderance of the evidence. *Id*. at 480.

[26] Here, contrary to Carr's assertion on appeal that S.G. never received a subpoena, *see* Br. of Appellant at 12, S.G. was personally served with a trial subpoena at the Hamilton County Prosecutor's office on November 14, 2017, which required her presence at trial on January 3, 2018. In addition, the State had been attempting to reach S.G. by telephone for the month preceding Carr's trial to no avail, and on January 2, 2018, it attempted to serve S.G. with an additional trial subpoena for January 3, 2018, by searching for her at her last known address and at a previous address. We conclude that the trial court did not abuse its discretion when it found that S.G. was unavailable for trial. Evid. R. 804(a)(5)(A).

[27] We also conclude that the evidence that supported our finding that Carr forfeited his confrontation rights established the foundation for the admission of S.G.'s statement under Rule 804(b)(5). Before Carr contacted S.G. in violation of the trial court's no-contact order and offered her money, a car, and place to stay, she cooperated with the prosecutor. After these wrongful contacts, she did

not. Carr had rejected a plea agreement in this case, and he told S.G. that he was trying not to go to trial. The sheer number of calls Carr placed to S.G. in the short period between June 26 and September 13, 2017, a time period which encompassed his first trial setting on September 11, 2017, coupled with the fact that when he did speak to S.G., he repeatedly talked to her about not going forward to trial is strong, probative evidence of Carr's wrongdoing as well as his intent, at least in part, to prevent S.G. from appearing at trial. After these contacts by Carr, S.G. did not respond to any efforts by the prosecutor to contact her, and the prosecutor was forced to serve her with a subpoena when she was at another prosecutor's office on another case.

[28] We agree with Carr that there is no evidence that he explicitly urged S.G. to absent herself from trial. Br. of Appellant at 17. However, even though Carr employed the carrot rather than the stick in his efforts, the circumstantial evidence presented by the State supported a reasonable conclusion that S.G. did not appear on January 3, 2018, because of Carr's efforts. Furthermore, Carr's arguments pertaining to the trial court's rationales for admitting the statement are unavailing, *see id.* at 17-19, as we may sustain the trial court's ruling on any basis supported by the record. *Ikemire*, 852 N.E.2d at 644. Finally, contrary to Carr's assertions on appeal, *see* Br. of Appellant at 18, given the ample evidence of Carr's own, active efforts to keep S.G. from trial, it is not necessary for us to impute to him his family's wrongdoing in erasing the only existing copy of S.G.'s deposition. The State showed by a preponderance of the evidence that S.G. was unavailable as a witness and that Carr engaged in wrongdoing that

was intended to, and did, procure S.G.'s unavailability to prevent her from testifying at trial. The trial court did not abuse its discretion when it admitted S.G.'s prior statement.

# Conclusion

[29] Given that Carr forfeited his confrontation right as to S.G.'s prior statement and in light of our conclusion that the trial court did not abuse its discretion when it admitted the statement under an exception to the hearsay rules, we affirm Carr's convictions.

[30] Affirmed.

Najam, J., and Altice, J., concur.