## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 29 2019, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Clarence Boris Miller, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | July 29, 2019 <br><br> Court of Appeals Case No. 18A-CR-2912 <br><br> Appeal from the Vanderburgh Circuit Court <br><br> The Honorable Michael J. Cox, Magistrate <br><br> Trial Court Cause No. 82C01-1704-MR-2236 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Clarence Miller was convicted of murder, a felony, and aggravated battery, a Level 3 felony, and was subject to a firearms sentencing enhancement. He was sentenced to a total of eighty-two years. Miller now appeals his convictions, raising two issues for our review which we reorder and restate as follows: whether the trial court erred in admitting certain hearsay evidence and whether the evidence was sufficient to support his convictions. Concluding the trial court did not abuse its discretion in admitting the hearsay statement and there was sufficient evidence to support Miller's convictions, we affirm.

# Facts and Procedural History

[2] In the early morning hours of April 15, 2017, Miller and a companion arrived at The Pony Gentlemen's Club in Evansville. Miller was wearing a camouflage shirt with light colored sleeves and a hat. Upon entering, Miller spoke for several minutes with Melissa Davis, an employee of the club who had known Miller for a few months and had been intimate with him a few times. Miller then paid for a private dance with a woman known as Holly. Miller and Holly went into a private room together.

[3] While in the private room, Miller touched Holly and asked her to have sex, both of which are against club rules. Holly reported the incident to Dave Hill, the security manager, who instructed security to remove Miller from the club.

Security team member Max Milburn saw Miller exit the private room and aggressively approach another security team member. Because it looked to Milburn as though Miller was going to take a swing at someone, he put Miller in a headlock from behind. The two "tussled a little bit," with Milburn's goal being to wear Miller out so he would want to leave. Transcript, Volume II at 232. Ron Chandler, another security team member, approached to assist and Miller punched him in the face. Security team member Mario Butler also stepped in to help restrain Miller. At 3:18 a.m., Miller and his companion were escorted from the building. General manager Scott Winterburn followed them out to ensure they left the premises. He described Miller as "pretty angry" when he left. *Id.* at 222. Winterburn also recorded video with his phone of Miller leaving to document identifying information in case Chandler wanted to press charges. Miller was not wearing a hat as he left.

[4] Butler heard Miller say, "I'll shoot this place up[,]" as he walked out the door and then repeat it after he went outside. Tr., Vol. III at 34. Chandler heard Miller threaten to return and communicated through his radio headset to other security team members that the customer "said he's going to be back[.]" Tr., Vol. II at 165. Chandler died prior to trial in an unrelated event.

[5] At about the same time Miller and security personnel were scuffling in the back of the club, Aaron Jennings, his cousin Daniel Sargent, and two friends arrived at the club to celebrate Jennings' birthday. Sargent went in alone to see if it was worth everyone paying the cover. As he walked around, he noticed "some kind of altercation." *Id.* at 185. Miller walked past Sargent as he was escorted out of

the building and Sargent heard him "talking crazy, something about he was going to come back, shoot up this place and all this other stuff[.]" *Id.* at 187. Miller may not have used those exact words, but "he insinuated he was coming back and shooting the place up." *Id.* at 198. Sargent thought "it was just somebody talking crap, just I mean drunk." *Id.* at 190. Jennings and his friends ultimately decided to come into the club.

[6] Approximately fifteen minutes later, Jennings and Sargent went back outside to smoke near the front entrance. Several people, including Gerald Bankston, were also outside smoking. Sargent walked toward the east parking lot with several other customers who said they had alcohol in their cars.[1] Within a matter of seconds, Sargent heard what sounded like a firework and then Bankston came around the corner of the building screaming and someone shouted "get down man, he's got a gun." *Id.* at 192. Sargent ran back to the front of the building to find Jennings on the floor just inside the front door of the Pony. Jennings had been shot on the left side of his torso. He was transported to the hospital where he died from his injuries.

[7] Bankston had arrived at the Pony close to 3:30 a.m. and stayed outside the front entrance to smoke a cigarette and "shoot[] the breeze" before going in. *Id.* at 127. About ten minutes after Bankston's arrival, he was shot three times. Bankston crawled along the sidewalk in front of the Pony and around the side

---

[1] The Pony is an alcohol-free establishment.

of the building, "hollering, screaming at the top of my lungs[.]" *Id.* Eventually, he crawled to his car and drove himself to a nearby gas station where he was able to summon help. Bankston suffered the following wounds: "I got shot . . . in my spine, it fractured my spine. I got shot in my side, in my thigh, . . . and I got grazed in my buttocks." *Id.* at 129. Bankston still suffers "[m]ental[ly], physically, . . . emotionally, everything. . . . I got shot multiple times for no reason, it's just going to stick with me for the rest of my life. . . . [Pain] keeps me from working. It keeps me from doing a lot of stuff." *Id.* at 131. Bankston did not see who fired the shots.

[8] Police recovered multiple shell casings from the parking lot to the west of the Pony. Two bullet holes were found in a car parked in that lot. Several days after the shootings, based partly on the license plate number Winterburn had documented as Miller and his friend drove away from the Pony, Miller was apprehended in Chicago and his car was impounded. A search of the car revealed a camouflage shirt with different colored sleeves in the trunk. DNA analysis of the shirt showed "a major profile . . . that was consistent with Clarence Miller." Tr., Vol. III at 86. The weapon used in the shooting was never found.

[9] The State charged Miller with murder, a felony, for the death of Jennings, and aggravated battery, a Level 3 felony, for the injuries to Bankston. The State

also sought a sentencing enhancement because Miller used a firearm when committing a felony offense.[2]

[10] Because Chandler was deceased, the State requested a preliminary ruling from the court on whether Hill would be allowed to testify to what Chandler told the security team that Miller said as he left the club. The State offered several justifications for admission of the statement: present sense impression, excited utterance, and evidence of the declarant's state of mind. The trial court preliminarily ruled that the evidence would be admitted as a present sense impression. *See* Appellant's Appendix, Volume II at 75 (stating Chandler's statement "was made immediately following, or very close in time to, the incident, and . . . was based upon [Chandler's] perception of the event"). During the jury trial, prior to the State calling Hill to the stand, Miller renewed his motion to exclude Hill "from testifying regarding any hearsay that he was told by [Chandler] who is now deceased and unable to testify and who's [sic] testimony was not preserved[.]" Tr., Vol. II at 153-54. The trial court clarified with the State that it intended to question Hill only as to what Chandler said after Miller was ejected from the club and prior to the shooting;[3] on that understanding, the trial court overruled Miller's objection. Hill testified that Miller and his friend left the club "and as far as I know they got in the car and

---

[2] A third charge, criminal recklessness as a Level 5 felony for shooting a firearm into a "building or place where people are likely to gather[,]" Ind. Code § 35-42-2-2(b)(2)(A), was dismissed.

[3] Chandler gave a statement to the police recounting Miller's statement at a later time.

that's when they said, [Chandler] had said something about [Miller] coming back over the radio . . . ." *Id.* at 163.

[11] The State also introduced into evidence several DVDs containing surveillance videos, including a compilation video from multiple sources and multiple angles. The compilation video begins by showing a man wearing a camouflage shirt and baseball cap with long hair standing in the Pony's parking lot with another man. At 2:40 a.m., the man and his companion enter the Pony. Davis identified Miller as the person entering the club at 2:40 a.m. At 3:18 a.m., Miller leaves the club, no longer wearing the hat. At 3:38:36 a.m., footage from Phillips Signs and Graphics, located two buildings to the west of the Pony, shows a man whose face is not visible wearing a camouflage shirt with light colored sleeves walking past the sign shop and crossing the parking lot toward the Pony.[4] Security footage from outside the front entrance of the Pony shows a group of approximately six men standing under the awning at that same time. At 3:38:46 a.m., one man flinches, one man falls down, and several of the men run into the club. At around the same time, video from a security camera at the Pony facing the west parking lot shows "what looks like a reflection between two cars just before the muzzle flash." Tr., Vol. II at 89. At 3:39:06, footage from the sign shop shows a man in a camouflage shirt with light colored sleeves

---

[4] The officer who collected the security camera footage determined, by comparing the time on the police "run cards" for this incident with the video showing police officers arriving, that the timestamp on the Phillips Sign security footage was one hour and nine minutes slow. In other words, if the time stamp showed 2:00 a.m., it was actually 3:09 a.m. In this particular instance, the timestamp showed a man walking past the sign shop at 2:29 a.m., which would translate to an actual time of 3:38 a.m.

running from the Pony back across the west parking lot toward the sign shop. The man is covering his face with his hands, but Davis identified Miller as the person running from his hair and his clothing. Tr., Vol. III at 8. Bankston identified himself as the man who fell down and crawled along the sidewalk in front of the Pony and around the corner. At 3:43:25 a.m., emergency vehicles begin arriving at the Pony.

[12] The jury found Miller guilty as charged. The trial court sentenced Miller to a total of eighty-two years in the Indiana Department of Correction. Miller now appeals.

# Discussion and Decision

## I. Admission of Evidence

### A. Standard of Review

[13] Hearsay is any statement made out of court and offered to prove the truth of the matter asserted in court. Ind. Evidence Rule 801(c). Hearsay is inadmissible unless it falls within one of the exceptions to the rule against hearsay. Evid. R. 802. We will reverse a trial court's ruling on hearsay only upon an abuse of discretion. *Carr v. State*, 106 N.E.3d 546, 554 (Ind. Ct. App. 2018), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Gaby v. State*, 949 N.E.2d 870, 877 (Ind. Ct. App. 2011). We will affirm the trial court's

evidentiary ruling on any basis supported by the record. *Carr*, 106 N.E.3d at 554.

## B. Hearsay Testimony

[14] Miller contends the trial court erred in admitting Hill's testimony about what Chandler reported to him about Miller's statements. Because Hill's testimony consists of hearsay within hearsay – Chandler relating to Hill what Miller said to Chandler – the statements are not admissible unless "each part of the combined statement" falls within a hearsay exception. *Myers v. State*, 887 N.E.2d 170, 189 (Ind. Ct. App. 2008), *trans. denied*; *see* Evid. Rule 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."). Miller's statement to Chandler was not hearsay because it was made by the defendant and offered against him at his trial. Evid. R. 801(d)(2)(A) (a statement is not hearsay if it "is offered against an opposing party and . . . was made by the party in an individual or representative capacity[.]"). Miller concedes his statement to Chandler constitutes a statement by an opposing party. *See* Brief of Appellant at 17. Therefore, we are only concerned with Chandler's statement to Hill.

[15] In seeking a preliminary ruling on the admissibility of Hill's testimony, the State offered several exceptions to the hearsay rule: present sense impression, Evid. R. 803(1); excited utterance, Evid. R. 803(2); and then-existing mental,

emotional, or physical condition, Evid. R. 803(3).[5] The trial court preliminarily ruled the testimony would be allowed as a present sense impression. In responding to Miller's objection at trial, the State primarily relied on that exception, and again, the trial court ruled the testimony was admissible.

[16] Evidence Rule 803(1) provides that "[a] statement describing or explaining an event, condition or transaction, made while or immediately after the declarant perceived it" is not excluded by the rule against hearsay. In order for a statement to be a present sense impression, it must: 1) describe or explain an event or condition; 2) be made during or immediately after the event or condition's occurrence; and 3) be based upon the declarant's perception of the event or condition. *Minor v. State*, 36 N.E.3d 1065, 1070 (Ind. Ct. App. 2015), *trans. denied*.

[17] The State offered *Amos v. State*, 896 N.E.2d 1163 (Ind. Ct. App. 2008), *trans. denied*, in support of allowing Hill's testimony. In *Amos*, the defendant's girlfriend, Keyonia, was speaking on her land line telephone to her sister, Lavonn, when Keyonia received a call on her mobile phone from the defendant. Keyonia put Lavonn on hold to speak to the defendant, who told Keyonia that he would kill her if she did not give him some money. After Keyonia ended her call with the defendant, she immediately returned to her call

---

[5] The State also noted that "arguably[,]" Evidence Rule 803(6) describing records of a regularly conducted activity, could also apply. Appellant's App., Vol. II at 49.

with Lavonn and told Lavonn what the defendant had said. This court held that Keyonia's statements to Lavonn qualified as a present sense impression:

> [W]hen Keyonia spoke to Lavonn, *she was describing and explaining the event* of the cell phone conversation with [the defendant]. The declarant, *Keyonia, also perceived the event* in that, during the course of a telephone conversation, a person perceives, through listening, the words of the other party. Additionally, Keyonia's statements regarding what [the defendant] had told her during their cell phone conversation were *made immediately after she had completed her cell phone call* with [the defendant]. . . . This proximity in time between the event and Keyonia's description of the event satisfies the requirement of the exception.

*Id.* at 1168-69 (emphasis added).

[18] The facts of *Amos* are very similar to the facts here and would seem to settle the issue, but Miller contends *Amos* was wrongly decided because "[i]n *Amos*, contrary to the Court's holding, the declarant was the defendant because it was the defendant who made the statement in question. [Keyonia] repeating the declarant's statement does not thereby also become a declarant." Br. of Appellant at 18. Accordingly, Miller asserts that "Chandler was not the declarant, Miller was the declarant." *Id.* A declarant is defined as "the person who made the statement." Evid. R. 801(b). Miller was the declarant when he made the initial statement to Chandler, and then Chandler was the declarant when he made a statement to Hill relaying what Miller had said. Miller did not

make a statement to Hill, which is what makes this a case of double hearsay.[6] We decline Miller's invitation to revisit the *Amos* court's holding.

[19] As for whether Chandler's statement to Hill was a present sense impression, Miller does not offer an argument other than that discussed above. Hill testified that after Miller and his friend left the Pony,

> as far as I know they got in the car and that's when they said, [Chandler] had said something about him coming back over the radio and he'd be back.
> Q: Is that immediately after [Miller] left?
> A: Yeah.

Tr., Vol. II at 163. Chandler was describing the event of Miller leaving the club during which he said he would be back. Chandler perceived the event by hearing Miller's words, and he immediately radioed the security staff to relate what Miller had said. As in *Amos*, the trial court did not abuse its discretion in determining Chandler's statement to Hill was admissible as a present sense impression.[7]

---

[6] Followed to its logical conclusion, Miller's argument that he remained the declarant for purposes of the hearsay analysis would also mean that the statement remains a statement by a party opponent and it would be admissible under that exception.

[7] We also note that Sargent testified that he heard Miller say he would be back as he exited the club and both Butler and Sargent testified they heard Miller say he would shoot the place up. Even if the trial court erred in allowing Hill to testify to the double hearsay statement, the error would not be reversible because the testimony was cumulative. *See Howard v. State*, 122 N.E.3d 1007, 1017 (Ind. Ct. App. 2019) ("[T]he erroneous admission of evidence that is merely cumulative of other evidence is harmless error.").

# II. Sufficiency of the Evidence

## A. Standard of Review

On appeal, we do not reweigh evidence or judge witness credibility. *Negash v. State*, 113 N.E.3d 1281, 1291 (Ind. Ct. App. 2018). We will consider only the evidence and reasonable inferences most favorable to the verdict. *Id.* "Reversal is appropriate only when no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* The State need not present direct evidence to support each element of the crime, as it has long been held that a conviction may rest on circumstantial evidence alone. *Perry v. State*, 78 N.E.3d 1, 8 (Ind. Ct. App. 2017). "Circumstantial evidence need not overcome every reasonable hypothesis of innocence. It is sufficient if an inference drawn from the circumstantial evidence reasonably tends to support the conviction." *Peters v. State*, 959 N.E.2d 347, 355 (Ind. Ct. App. 2011) (citation omitted).

## B. Evidence of the Crimes

Miller was convicted of murder and aggravated battery for firing the shots that killed Jennings and wounded Bankston. Miller argues the State's evidence is insufficient to support his convictions because there is no direct evidence of his guilt and insufficient circumstantial evidence from which the jury could have reasonably drawn an inference that Miller was the shooter without resorting to "mere guess, conjecture, surmise, possibility or speculation[.]" Br. of Appellant at 13 (quoting *Eifler v. State*, 570 N.E.2d 70, 75 (Ind. Ct. App. 1991), *trans. denied*).

[22] As stated above, a conviction may be sustained on circumstantial evidence alone, even a conviction for murder. *See Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016). In this case, the circumstantial evidence reveals that:

- Miller was told to leave the Pony at 3:18 a.m. for violating club rules;

- Miller fought with club security before leaving;

- Miller was "pretty angry" when he left, Tr., Vol. II at 222;

- As he left, Miller said that he would be back, and one security guard and at least one customer heard him say he would "shoot this place up," Tr., Vol. III at 34;

- At 3:38:36 a.m., surveillance video shows a man wearing the same clothes that Miller was wearing twenty minutes earlier when he was in the Pony walking from the west toward the Pony;

- At 3:38:46 a.m., surveillance video shows one man outside the Pony flinch and dive toward the front door and one man fall down and drag himself around the side of the building. Bankston identified himself as the man who fell down and described being shot in the back and the leg;

- At around the same time, surveillance video of the west parking lot shows what a police officer described as a reflection between two cars and muzzle flashes;

- At 3:39:06 a.m., surveillance video shows a man in the same clothes Miller had been wearing earlier running across the west parking lot and away from the Pony;

- Davis identified the man seen in the surveillance video walking toward the Pony and then running back less than one minute later as Miller;

- Shell casings were found in the spot where the reflection and muzzle flashes were seen; and

- The shirt the man in the videos is wearing was found in Miller's car trunk and had his DNA on it.

[23] No one saw the shooter, and Miller posits that it is "sheer speculation and surmise" to conclude from this evidence that Miller is the unidentifiable person seen hovering in the west parking lot or that the flashes of light in that area were muzzle flashes from a gun. Br. of Appellant at 14. Having viewed the surveillance videos, we agree with Miller that the video of the west parking lot which purportedly shows a person and muzzle flashes is inconclusive at best. But even without that portion of the compilation video, there is sufficient evidence from which a reasonable fact finder could determine that the State had proven its case. Miller was angry when he left the club at 3:18 a.m. and threatened to return and shoot up the place. A man wearing clothing identical to what Miller had been seen wearing at the club walks toward the Pony at 3:38:46 and runs back from the direction of the club at 3:39:06 – less than a minute later. In that minute, two men are shot while standing outside the Pony. Davis positively identified Miller as the man running away from the Pony and the shirt the man is wearing in the videos was found in Miller's car and contained his DNA. A reasonable inference from this evidence is that Miller is the person who shot at the Pony, striking both Jennings and Bankston.

[24] Miller admits being in the club earlier in the evening but posits that "it is just as reasonable" to conclude from the surveillance videos that "Miller was simply fleeing for his life" from another person in the area who fired the shots. Br. of Appellant at 15-16. This is a request that we reweigh the evidence and speculate that there even was another person in the area – one who was not visible on any surveillance videos before, during, or after the shooting and one who had a perceived reason to shoot at the club. Given the circumstances under which Miller left the club, the short frame of time in which Miller was seen walking toward the Pony and then running back from the Pony, and the fact that a shooting took place during that time, we conclude the evidence was sufficient to support his convictions.

# Conclusion

[25] The trial court did not abuse its discretion in admitting Chandler's hearsay statement as a present sense impression and there was sufficient evidence to support Miller's convictions. Accordingly, his convictions are affirmed.

[26] Affirmed.

Baker, J., and Najam, J., concur.